1. Whenever a transaction is between husband and wife and the creditors of the husband attack it for fraud, if the wife claims the property purchased or received from the husband, the onus is upon her to make a fair showing about the whole transaction.
(a) Under the foregoing ruling, the court did not err in overruling the demurrer as to the prayers of the petition asking that the stock in the plaintiff corporation and in two other corporations be decreed back into the husband, that a lien be established thereon in favor of the plaintiff corporation, and that in the meantime the wife be restrained from transferring such stock.
(b) The evidence fails to show, however, any participation by the wife in the alleged wrongful acts of the husband. Accordingly, a personal judgment against the wife for the claims against the husband is unauthorized, but since material relief was obtained against the wife, the judgment against her for the court costs in the court below is not disturbed; and, since the court has not as yet exercised its discretion in awarding the auditor's costs, that matter remains in the sound discretion of the court.
2. Where the members of a solvent partnership joined in the organization of a solvent corporation, to which they transferred all the partnership assets without any other consideration being paid into the corporation, or other capital invested, and where stock in the corporation was issued to the partners in exactly the same proportion in which they had been interested as partners, and the corporation continued the operation of its former business under the same management, the partnership at the same time ceasing to do business, it will be assumed, in the absence of anything to the contrary appearing, that the partners by the action thus taken between themselves, intended that the corporation would take over the assets cum onere, insofar as pertained to partnership debts owing to its own members; and this is true irrespective of any contrary rule which might obtain with respect to outside creditors who were not in any wise parties to any such merger, and who did not *Page 756 
consent to a substitution of their claims against the partnership and its members, and the partnership assets, by virtue of such a merger.
(a) This rule would obtain irrespective of the validity or invalidity of subsequent action taken by the stockholders of the corporation, undertaking to specifically assume such previous partnership obligations owing to its members.
(b) Under the provisions of the Code, § 3-707, any such mutual claims for indebtedness existing between a partner and the corporation would not be barred by the running of the statute.
3. The rulings of the auditor, as set forth in full in the statement of facts, have been examined, and with the exceptions above noted, are approved as being in conformity with the law and supported by the evidence.
 No. 15229. SEPTEMBER 10, 1945.
This was a suit in equity by J. S. H. Company and two of the three equal stockholders therein against the third stockholder, Jones, in which his wife was joined as a defendant. It was alleged that Jones actively managed the business of the corporation, and with his wife was indebted to it in the sum of $10,224.70 arising out of various transactions had and performed by Jones through a long period of years, for which no accounting had been made. By amendment it was further alleged that Jones, with the intent to defraud the plaintiffs and in order to avoid payment of his obligations to the corporation, had transferred almost all of the stock in the corporation to his wife by voluntary conveyance, and that he had mingled the funds of the corporation with the funds of two other corporations in which Jones was largely interested and which he managed and controlled. The petition prayed for an accounting, and asked a general judgment against Jones and his wife, including amounts alleged by amendment to have been collected by both of them, and that his wife be restrained from transferring the stock in the plaintiff corporation, that she also be restrained from transferring the stock in the two other corporations mentioned, and that the title to the stock transferred by Jones to his wife in all three of these corporations be decreed back into him, and that a lien be decreed against all of such stock in favor of the plaintiffs to enforce the judgment to be rendered in their favor. The case was referred to an auditor, who found in favor only of the corporation in the sum of $5330.69 against both Jones and his wife, and also found that the transfer of the *Page 757 
stock in the three corporations was fraudulent as against the plaintiffs, and recommended that a lien thereon be established in favor of the plaintiff corporation, and that Mrs. Jones be restrained from transferring the same. On exceptions to the auditor's report, the court sustained the findings of the auditor that the transfer of the stock was fraudulent and void as against the plaintiff corporation, and overruled and disapproved all exceptions of law and fact except certain ones of fact which were submitted to a jury for determination. The jury having found in favor of the plaintiff and against all the exceptions thus submitted to them, the court overruled such exceptions of fact, thus sustaining the auditor in all of his findings both of law and fact, and made such findings the judgment and decree of the court. The court, having directed a verdict against the defendant for costs, entered judgment accordingly. After a motion for new trial had been made and overruled, the exceptions of law, which had been reserved pending the jury's findings on the approved exceptions of fact, were overruled, and a decree was entered in favor of the plaintiff corporation against Jones and his wife for $5330.69; restraining Jones and his wife from transferring any stock held by them in the three corporations referred to; declaring a special lien therefor on the stock in J. S. H. Company registered in the name of Mrs. Jones; and taxing costs against Jones and his wife. The record is very voluminous, but a comprehensive view of the points at issue can be obtained from the report of the auditor, which we have here embodied and the paragraphs of which we ourselves have numbered for the purpose of reference.
The report of the auditor was as follows: (1) "Mrs. L. L. Shreve, H. G. Hubbard, and J. S. H. Company, a corporation, filed suit on April 24, 1941, against W. A. Jones, Mrs. M. D. Jones, his wife, and Madronah Sales Company, alleging that J. S. H. Company was duly chartered in Fulton superior court and began doing business in January, 1933; that P. C. Shreve, H. G. Hubbard, and W. A. Jones each owned 33 1/3 shares of its capital stock; that cash and various real estate were put into the corporation by its stockholders; that Jones was elected president and was in active charge of its business; that he transferred his stock in the company to his wife except for two shares; that in March, 1941, a stockholders' meeting was held at which Hubbard was *Page 758 
elected president and Mrs. Shreve was elected vice-president and secretary (she being the widow of T. C. Shreve and his stock having been bequeathed to her); that demand was made that Jones turn over all books and cash to the new officers; that Jones turned over a book of accounts; that this book shows various receipts by Jones, and various credits for amounts paid on corporate indebtedness; that Jones failed to account to the company for large sums received by him for its account; that Jones put money, wrongfully taken from the company, with the money of his wife, Mrs. M. D. Jones."
(2) "Plaintiffs pray that Jones and Mrs. M. D. Jones be required to account for sums belonging to the company and coming into their hands, alleged to exceed $10,000, and that judgment be had against them for said amount. There are also prayers for receiver, injunction and general relief."
(3) "The defendants, Jones and Mrs. Jones, filed an answer denying indebtedness to the company in any sum, and setting up by cross-bill a counterclaim for $10,275 against the partnership of Jones, Shreve, and Hubbard, which partnership went out of existence in 1932, and also a counterclaim against the company for $7397.50 for services rendered and for the value of office accommodations, stenographic services, etc., provided by Jones for the company from the date of its organization down to March, 1941. Plaintiffs' demurrer to the first counterclaim was by order of December 19, 1941, sustained; also demurrer to the second counterclaim was sustained with leave to amend."
(4) "The defendant, W. A. Jones, amended the cross-bill as to both counterclaims. The first counterclaim for $10,275 arising out of the partnership was later by amendment expressly abandoned."
(5) "To the cross-bill as amended, plaintiffs renewed their demurrers on March 10, 1942. Upon these renewed demurrers I have entered an order sustaining the same."
(6) "By order of May 23, 1942, the case was referred to me as auditor to pass upon all questions of law and fact."
(7) "Thereafter plaintiffs amended their petition, one amendment alleging that Jones, at the time the J. S. H. Company was organized, likewise organized Darnell Security Company and Madronah Sales Company, that shortly thereafter he transferred substantially *Page 759 
all his stock in these companies to his wife by voluntary and fraudulent transfers, and that he mingled the assets of these corporations and treated them as his own property."
(8) "To plaintiffs' amendments the defendants demurred. Upon these demurrers I am entering orders overruling them."
(9) "Hearings. [The dates of hearings were here enumerated.]"
(10) "By agreement of counsel the stenographer's transcript is filed herewith and made a part of this report. By agreement the auditor does not abstract the contents of scores of pieces of documentary evidence, but files them herewith in a sealed envelope appropriately identified."
(11) "On account of the great number of disputed items in the accounting, the testimony took a wide range, and in many respects it is very obscure. However, the auditor has read and reread that transcript of the evidence and examined and re-examined the documentary evidence, and makes his findings of fact with reasonable confidence in their correctness. The auditor has thought it best to state separately the disputed items and to make separate findings of fact (herein called `findings') and conclusions of law (herein called `conclusions') with respect to the various items. The auditor's findings relate to the book prepared by the defendant, W. A. Jones, and submitted to the new officers of the company, which book is now a part of the record in the case, and the auditor makes findings for or against the credits therein claimed, as well as making findings and conclusions with respect to other items involved in the pleadings and the evidence."
(12) "Findings and Conclusions. — I find: J. S. H. Company was chartered in Fulton superior court on November 18, 1932, and began business on December 31, 1932. Jones, Shreve, and Hubbard were tenants in common of numerous tracts of real estate which were from time to time bought, developed, and in part sold by them. Their business began in the year 1921 and continued up until the end of the year 1932, when all, or substantially all, of the real property, notes, and cash so owned by them was transferred to the company in exchange for its capital stock. The many tracts of real estate owned by them individually were *Page 760 
conveyed to the corporation `subject to unpaid balances due on some and loans on some.'"
(13) "I find: The bylaws of the company provided that the secretary or treasurer shall deposit all money of the company in a bank or banks, pay bills with the company's check or in cash, taking receipts therefor. Jones was in January, 1933, elected president and treasurer of the company and so continued until he was removed in March, 1941. He made all sales in behalf of the company and collected all money owing to the company. Nevertheless, he never at any time deposited any company money in a bank, and when removed from office turned over no money to the new officers."
(14) "I find: The bylaws provided that the treasurer or secretary would keep a `full and accurate set of books, showing receipts and disbursements.' Jones handled all company money. He made no pretense of keeping any set of books and never made an account of receipts and disbursements from the beginning in January, 1933, down until March, 1941. When removed from office he prepared such a book for the first time, setting forth in three pages what purported to be a full and correct statement of receipts and disbursements. At the hearings before the auditor he made numerous claims of credits in his favor not shown on the book; and after plaintiffs had established by disinterested witnesses receipts not shown on the book he then for the first time admitted such receipts."
(15) "Receipts. — I find: W. A. Jones received for the account of the company, as admitted in his accounting, the following:
December 31, 1932, brought forward from partnership, $1612.23 December 31, 1932, E. L. Jones, balance on lot, 919.30 October 24, 1933, E. L. Jones, sale of another lot, 1000.00 February 10, 1936, Roddy notes, balance, 110.00 November 13, 1936, sale to Bannister, 600.00 February 2, 1938, sale to Wilson, 500.00 April 1, 1940, sale to Belcher, 1500.00."
(16) "These sums, except the $1000.00 items, are not correctly and fully set forth. These receipts show only the principal sum on real-estate sales, and do not take into account and accurately list interest received on deferred payments. As to such *Page 761 
interest payments received by the company, the record is not in such shape that these interest payments can be stated with the slightest degree of accuracy. But it is found, however, that Jones is accountable at all events for these principal sums."
(17) "I find: That, in addition, in March, 1939, the company sold to A. B. Medlock a lot for $607.50. As to this item, paid in cash, I find that a portion was expended for proper corporate purposes, and that the balance was divided pro rata among the stockholders; and that Jones has fully accounted for the proceeds of the Medlock sale."
(18) "Disbursements. — Credits, $12.80, April 17, 1933, and $10.80, Jan. 1, 1936. I find: Credit is claimed for the two items above, each paid to First National Bank. Jones testified that these were payments to the bank on notes owed to the Grove Estate on property owned by the company. The evidence shows that these were partial payments on a small loan owed to the bank on a note signed by Jones, Shreve, and Hubbard, and apparently unrelated to the company or any of its property. Why only these two payments on the $115.00 note are claimed as credits does not appear. I conclude: These two credits are improper and must be denied."
(19) "Credit, $810.00, January 17, 1934. I find: Jones claims credit for $810.00, testifying that this credit represents commissions on sales made by him at various times prior to the organization of the company, except one item of $50.00 embraced therein for the sale of a lot by the company to E. L. Jones. The authority relied upon by Jones is a resolution at a meeting of the stockholders of the same date the credit bears, the resolution being presumably drawn by Jones, and reading: `On motion, duly adopted, it was agreed to pay a commission according to the rules of the Atlanta Real Estate Board to any member of the former partnership before incorporation or officer of the company on any sales of real estate in the past and to pay a like commission on sales made in the future on property owned by the company.' Hubbard was not present at the special meeting at which this resolution was adopted. There is no evidence that he was notified of the meeting. I conclude: This resolution affords no legal basis for the charge, except the $50.00 for sale of the lot to Jones, and as to the balance is improper and must be disallowed. Technically, *Page 762 
the stockholders had no power under the bylaws to pass such a resolution. Treating the resolution as a directors' meeting, two of the three directors only were present, and Jones being financially interested and the resolution being enacted for the purpose of serving his interest, which interest was adverse to that of the company, he was disqualified from participating in the voting, and, without his affirmative vote, the resolution could not have carried. Furthermore, the resolution, as I construe it, relates only to the sales of property of the company, and except for the sale to E. L. Jones none of the lots for which commission is here charged were the company's property. Any ambiguity in the language must be construed against Jones, and, so construed, it can not be held to relate to the lots sold prior to the organization of the company. Were it so construed, it would be ultra vires, there being no evidence tending to establish the company's liability for commissions on such sales. Accordingly, I disallow the credit except for the one item of $50.00 embraced therein."
(20) "Credit item of $1,000, January 17, 1934. Defendants expressly, by pleading and at the hearings before the auditor, withdrew claims for this credit."
(21) "Credit item of $190.02, October 30, 1934. I find: That the bill for insurance covers property some of which was never owned by the company, so far as the evidence shows, and other items cover insurance incurred before the company came into existence. Two items aggregating $39.20 of the total do cover property owned by the company during a portion of the time the policy was in effect. I conclude: This item should be allowed to the extent of $39.20, and the balance disallowed."
(22) "Credit, payments to V. B. Moore. The detail of these credits is: May 17, 1935, $40.00; May 17, 1935, $80.00; January 7, 1937, $80.00; January 7, 1937, $80.00; January 27, 1937, $94.25."
(23) "I find: The company held property subject to a loan deed in favor of Mrs. V. B. Moore. The description in the deed into the company and the description in the deed pursuant to sale under the power in the loan deed are dissimilar and confusing, but they appear to describe the same tracts. Jones testified that they were the same. I so find. The credit claimed for $94.25 is supported by a bill by Jones-Logan Co., Inc. for various items *Page 763 
of premiums on insurance against V. B. Moore, the bill being marked `paid.' There is no evidence that this bill was paid by Jones or that this paid bill was in fact accepted by Mr. Moore or Mrs. Moore as a credit against the debt secured by property owned by the company. When various other credits are added to the interest shown to be then owing when the property was sold under the power in the loan deed, it would not appear that the mortgagee gave credit on the mortgage debt for the item of $94.25."
(24) "I conclude: The credits enumerated above are to be allowed except for the item of $94.25, which is disallowed."
(25) "Credits, Atlanta Banking Savings Co., and Atlanta Title Trust Company. The detail of these credits claimed is as follows: [Then follow thirteen named amounts under dates beginning May 4, 1933, and ending December 23, 1940.]"
(26) "I find: That the irregular manner in which these payments were made and entered and the testimony of Jones with reference to these payments, which testimony was manifestly inaccurate in some respects, are sufficient to cast suspicion on these credits; yet the documentary evidence is sufficient to establish that these obligations were owed on property owned by the company and were finally discharged on December 23, 1940, the date shown in the accounting."
(27) "I conclude: That these credits were proper disbursements and should be allowed."
(28) "Credit of $600.00 on August 10, 1937. I find: Madronah Sales Company owned a lot which Bethany Church desired in exchange for a lot it owned. Madronah Sales Company conveyed to the church, and the church, instead of conveying to Madronah Sales Company, conveyed to J. S. H. Company. Jones then took credit for $600.00, the value which he placed upon the lot. The bylaws provided that the directors had charge of purchases and investments. There is no evidence that the other directors ever knew of this transaction. Jones testified Shreve signed the deed, but the fact is that the company made no deed. Hubbard denied knowledge."
(29) "I conclude: The company never authorized this transaction and the credit must be disallowed. The right of Madronah Sales Company to have this lot conveyed to it is not here involved." *Page 764 
(30) "Credit, $325.00, April 1, 1940. I find: This credit is for commissions on sales to Belcher, Bannister, Medlock and exchanges with Coursey and with Bethany Church."
(31) "I conclude: Having found the church transaction was unauthorized, the $50.00 commission must be denied; otherwise the credit is allowed."
(32) "Credit, $268.00, September 3, 1940. I find: Jones testified this represents money he advanced in the years 1936, 1937, 1938, 1939, and 1940 to pay to the Grove Estate interest on loans on various property. He claims that part of the property on which interest was paid was owned by the company. However, he does not produce the notes nor correspondence with the Grove Estate when payments were made from time to time identifying the debt and the property."
(33) "I conclude: There is no sufficient evidence to establish that Jones did in fact advance this money individually on debts on company property, and it must be disallowed."
(34) "Credit, $220.00, March 7, 1941. I find: Jones testified that in March, 1941, after the controversy with the other stockholders had arisen, he paid $600.00 to the Grove Estate on a balance of $1040.00 on company property; that, in so doing, he saved the company $440.00; that it was `understood all the way through if anyone made a saving through a settlement they got fifty per cent.' There was no bylaw to this effect. The testimony as to the understanding is extremely vague and can not be accepted."
(35) "I conclude: Jones had no legal authority to credit himself with this sum; and it must be disallowed."
(36) "Credit, $450.00, March 7, 1941. I find: This credit is claimed for lots sold in 1921, 1922, and 1923, all ten years before the company came into existence, and is claimed as of a date ten years after the affairs of the so-called partnership had been settled. The credit bears date twelve days before Jones was put out of office. Every inference is warranted that the liability for sales twenty years before that time had long before been settled. I conclude: In no event was the company liable for these commissions, and the credit claimed is denied."
(37) "Counterclaim for services and expenses. Services — I find: Jones testified at great length about his activity, political, *Page 765 
civic, and otherwise in developing the area in which the company's property is located; that he was regular attendant at meetings of county commissioners; that he was instrumental in getting a school and stores located nearby; that he was instrumental in getting the county to lay water mains and sewers in the vicinity, part on the company's property which resulted in a lawsuit. Hubbard testified that he and Shreve (were) equally or more active. Jones testified as to his many other activities, producing for him an income of $700.00 or $800.00 per month, and that he gave one-fourth of his time to the company's business. The bylaws provided no salary to officers. Even assuming a legal right to recover on a quantum meruit for services rendered (against which contention I have decided, in sustaining a demurrer to the cross-bill) I find, alternatively, that there is no evidence to sustain a finding of any definite valuable services rendered to the company. The evidence seems to relate principally to a time before the company was organized, and the activities were inspired by political and civic motives, and for the benefit of others rather than the company. The testimony that, with his many interests, he gave one-fourth of his time to the company's business. I reject. All the evidence points to the smallness of its business, and to the neglect of its affairs. If otherwise entitled to recover the reasonable value of such services, there is no sufficient evidence upon which I can find the nature and extent of the services rendered for the benefit of the company, the time when rendered, or their reasonable value."
(38) "Expenses. — I find: The evidence shows that Jones paid for the use of part of an office $13.25 per month for all his activities. There is no evidence of any need this company had for an office, or anything in the nature of stenographic services, stationery, and postage except a rare letter. There is no evidence of what, if anything, Jones paid for such facilities and services, and accordingly there is no evidence upon which to predicate a finding that he is entitled to be reimbursed in any sum whatever."
(39) "Rents. — Plaintiffs assert that Jones and Mrs. Jones are accountable for rents on 368 and 370 West Lake Avenue and on 24 North Elizabeth Street. The conduct of Jones warrants at least suspicion. In the accounting furnished before this suit was filed and in the accounting filed in court in this suit, no rents are *Page 766 
shown as being received. Not until plaintiffs had produced witnesses and affirmatively established the collection of rents did Jones admit their receipt, and then only to the extent plaintiffs had made proof. As some of the rents were received immediately before this suit was filed, it is difficult to see how they could have been overlooked. Jones, admitting receipt of rents and his failure to set them up in his accounting, produced various memoranda which, he testified, represented disbursements for repairs and water bills on the property in excess of rents collected. Some of this testimony is doubtful. He admitted $122.50 as received from 24 North Elizabeth Street, which plaintiff had established, being $10.00 per month, and payment of water bills on the same property for nearly five years. Jones admitted receipt of $90.00 in 1933 and 1934 on the West Lake property but testified all this, and more, was spent in repairs prior to foreclosure in May, 1934."
(40) "I find: The evidence as to rents and repairs is so uncertain that I cannot make a finding upon it. At the same time it is a matter of common knowledge that, particularly in 1933 and 1934, vacancies were high, rents were often not paid and repairs were excessive on property of this character. As to 24 Elizabeth Street, I have already concluded that the company is not liable for the $600.00 charged against the company as a purchase-price, and hence it is not entitled to rent on property for which it should not pay."
(41) "I conclude: There is no sufficient evidence to sustain plaintiffs' contention that Jones collected rents from company property in excess of sums spent for repairs on the same property."
(42) "Sale of other lots. — Plaintiffs allege that Jones sold on behalf of the company many other lots, and failed to account for the purchase-price. This contention is based upon credits claimed as real-estate commission to Jones."
(43) "I find: That there is no evidence of the sale of any other real estate except as shown in the accounting with the exception of the Medlock sale, the disposition of the proceeds of which are adequately accounted for."
(44) "Liability of Mrs. M. D. Jones. — The original petition charges in paragraph 28, upon information and belief, that Jones put the proceeds of money illegally gotten from J. S. H. Company with the money of his wife, Mrs. M. D. Jones, and prays judgment *Page 767 
against both W. A. Jones and Mrs. M. D. Jones. They denied this allegation."
(45) "I find: Mrs. Jones did not appear as a witness in the case. Mr. Jones testified repeatedly and at great length. Although it appeared that the company never at any time had a bank account and the evidence tended to indicate that Jones did not have a bank account, he never at any time explained what became of its money. There should have been substantial amounts on hand at all times. Jones had taken credit for very substantial sums as paid to himself, which he thereafter claimed as his own. In May, 1933, he transferred to his wife all the stock he held in the Madronah Sales Company and in Darnell Security Company and all except two shares of his stock in J. S. H. Company. After these transfers he had substantial property, and from time to time judgments were rendered against him. From these facts, I find, as an ultimate fact, that the money of J. S. H. Company, except for credits properly allowed, were, like his stock, turned over to Mrs. Jones."
(46) "I conclude: Having so found, I conclude that Mrs. Jones is jointly liable with W. A. Jones for money of J. S. H. Company turned over to her and not properly accounted for, together with legal interest thereon."
(47) "Alternative finding and conclusion. As an alternative to the foregoing finding and conclusion, I further find and conclude as follows:"
(48) "I find: About the same time that this company was organized, Jones organized two other corporations, Darnell Security Company and Madronah Sales Company. On May 12, 1933, after Jones had become liable for funds of this company, he transferred to his wife, Mrs. M. D. Jones, 49 shares in Madronah Sales Company, 48 shares in Darnell Security Company, 31 1/3 shares in J. S. H. Company. After making these transfers he was insolvent. Judgments were thereafter rendered against him which are unpaid. There is no evidence of any consideration for these transfers. Mrs. Jones did not testify. I find that these transfers were voluntary; that Jones was thereby rendered insolvent; that the transfers were made with the intent to remove the property beyond the reach of Jones' creditors; that J. S. H. Company was on May 12, 1933, a creditor of Jones." *Page 768 
(49) "I conclude: That the transfer to Mrs. M. D. Jones of the stock as above set forth was a fraudulent conveyance and being voluntary, is void as against J. S. H. Company; and that she is liable in any event to account to the company for the stock so wrongfully transferred to her."
(50) "Liability for interest. — I find: Upon the organization of the company it received a large sum in cash or its equivalent and from time to time other large sums. The company had no bank account. Jones' accounting sets up credits which counterbalance the receipts, and after certain payments to others, claims the difference as owing to himself. From this the inference is required that he did not at any time hold the cash of the company earmarked as its money and for its use and benefit. At all times there were outstanding interest-bearing obligations against its property and, had its funds been applied on these obligations, the company's liability for interest on these obligations would have been correspondingly reduced."
(51) "I conclude: That in an accounting he is properly chargeable with interest at the legal rate on all receipts shown from the date of receipt less such credits set up in his statement of accounts as I find are proper credits. Giving effect to such receipts and interest charged thereon from the date of receipt and proper credit for disbursements, I find that the defendants are liable to account to the company in the sum of $5,330.69 as of March 19, 1941, with interest from the date of 7% per annum."
(52) "Costs. I find: That Jones and Mrs. Jones did not in good faith account for funds of the company coming into their hands; that he did not keep regular books of account; that he received amounts and concealed the facts until proven in hearings before the auditor; that the uncertainty and confusion regarding the company's business has been due to his lack of directness and candor."
(53) "Therefore, I recommend that all costs, including costs of this reference to an auditor, be, in the final decree, assessed against the defendants."
The foregoing auditor's report was followed by an exhibit setting forth receipts and disbursements "(insofar as proper credits)," showing the date, the transaction, and the amount of each item. *Page 769 
1. "Transactions between husband and wife and near relatives, to the prejudice of creditors, are to be closely scanned and their bona fides clearly established.Booher v. Worrill, 57 Ga. 235; Smith v. Wellborn,75 Ga. 799; Gray v. Collins, 139 Ga. 776, 780
(78 S.E. 127). . . Whenever a transaction is between husband and wife, and the creditors of the husband attack it for fraud, if the wife claim the property purchased or received from her husband, the onus is on her to make a fair showing about the whole transaction. Code, § 53-505; Richardson v. Subers, 82 Ga. 427
(9 S.E. 172); Strickland v. Jones, 131 Ga. 409
(62 S.E. 322); Gill v. Willingham, 156 Ga. 728 (4) (120 S.E. 108). The mere introduction of a conveyance from the husband to the wife would not shift the burden from her to the plaintiff, the burden being on her to show that the whole transaction was fair. Simmons v. Realty Investment Co., 160 Ga. 99
(127 S.E. 279). . . Conveyances may be fraudulent as to subsequent creditors as well as existing creditors, if made with intent to defraud. First National Bank of Cartersville v. Bayless,96 Ga. 684 (23 S.E. 851); Lane v. Newton, 140 Ga. 415 (2) (78 S.E. 1082); Almand v. Thomas, 148 Ga. 369 (6) (96 S.E. 962); Cohen v. George, 149 Ga. 701 (101 S.E. 803);Duncan v. Freeman, 152 Ga. 332, 334 (110 S.E. 5);Sullivan v. Ginsberg, 180 Ga. 840, 845 (181 S.E. 163)."State Banking Co. v. Miller, 185 Ga. 653, 655
(196 S.E. 47).
(a) Under the foregoing rulings, the court did not err in overruling the demurrer as to the prayers of the petition asking that the stock in the plaintiff corporation and the two other corporations be decreed back into the defendant Jones, that a lien be established thereon in favor of the plaintiff corporation to protect the judgment rendered herein, and that in the meantime Mrs. Jones be restrained from transferring said stock. See paragraph 7 of the auditor's report.
(b) So far as we have been able to find from the voluminous evidence, there is nothing to indicate that Mrs. Jones had knowledge of, or in any wise personally participated in, any wrongful acts and doings of the defendant Jones, nor have counsel pointed *Page 770 
out any to us. Her entire connection with the case appears to be that she merely became the recipient of the stock voluntarily assigned to her by her husband. Accordingly, we think that the personal judgment against her is unauthorized by the evidence, and so hold. See paragraphs 44, 45, and 46 of the auditor's report.
2. In the hearing before the auditor, the defendant Jones sought to establish certain credits as an offset to the claims of the plaintiffs, which arose out of transactions prior to the organization of the plaintiff corporation while the stockholders were operating the same business as a partnership. These alleged credits the auditor refused to allow, on the theory that, whether the claims were good or bad, they could not be thus set up in reduction of the plaintiffs' claims. In this respect we think that the finding of the auditor was erroneous. Here the members of a solvent partnership, engaged in the development and sale of land into residential lots, joined in the organization of a solvent corporation, to which they transferred all the partnership assets, including equities in realty held under bonds for title; and, under such merger, without any other consideration being paid or other capital invested, stock in the corporation was issued to the partners in exactly the same proportion in which they had been interested as partners, and the corporation continued the operation of the former business without interruption and under the same management, the partnership at the same time ceasing to do business. Under such circumstances, in the absence of any understanding to the contrary, it would be presumed that such a new and solvent organization would be answerable for such claims as the previous partnership might have owed to its own members. In a case where the rights of third-party creditors are involved, a different rule has been stated. Under those holdings, it has been said that a merger of a partnership into a corporation and the assumption by the corporation of debts owing third parties by the previous partnership do not ordinarily affect the rights or status of outside creditors. Under this view, and in the absence of consent by such creditors to the valid assumption by the corporation of their claims and the substitution of liability therefor, such incorporation and assumption of liability neither bar the claims of creditors against the partnership and its members or against the partnership assets, nor create an enforceable obligation in favor of *Page 771 
such creditors against the corporation. Mobley v. HagedornConstruction Co. 168 Ga. 385, 397 (147 S.E. 890); GeorgiaCo. v. Castleberry, 43 Ga. 187; Taylor Lumber Co. v.Clark Lumber Co. 33 Ga. App. 815 (1, 2) (127 S.E. 905). See, in this connection, 4 Thompson on Corporations (3d ed.), p. 20, §§ 2437, et seq. Here, however, the rights of outside creditors were not involved; and, when the partners by mutual agreement between themselves transferred the entire assets of the partnership into a solvent corporation wherein it was merged, it must be taken that as between themselves, and acting for themselves, it was intended that the corporation would take over the assets cum onere insofar as pertained to partnership debts owing to its own members.
(a) Such being the presumptive rule under the state of the particular facts outlined, irrespective of the resolution adopted at the stockholders' meeting about a year after the incorporation — where the minutes showed that, "On motion, duly adopted, it was agreed to pay a commission according to the rules of the Atlanta Real Estate Board to any member of the former partnership before incorporation or officer of the Company on any sales made of real estate in the past and to pay a like commission on sales made in the future on property owned by the Company" — it follows that the auditor erred in ruling that the corporation was not liable for the previous debts of the partnership to its members, which had been incurred prior to the incorporation. The reason assigned by the auditor why such resolution was ineffective, that only two of the three equal stockholders were present and that it required the vote of a party at interest to pass the resolution, ultra vires in character, could not operate to change the already-outstanding status as to liability independently of the validity or invalidity of the resolution.
(b) Nor do we think that such claims as might be properly established would be barred by the statute of limitations, since under the provisions of the Code, § 3-707, the mutual indebtedness claimed by each of the parties would prevent the running of the statute, the purpose of these proceedings being a general accounting between the parties as to their mutual claims and obligations. As to the items in the decree referred to by the ruling in this division of the syllabus opinion, see paragraphs 18, 19, 21, and 36 of the auditor's report. *Page 772 
3. We have examined as best we could the record in its entirety and consider the exceptions taken to the findings of the auditor, other than those submitted to the jury, to be without merit, except as hereinbefore indicated, and that all such rulings and findings of the auditor, as approved by the trial judge, are supported by the evidence and in accordance with law. The case is therefore remanded to the court below for additional findings of fact on the one question, among those which were not submitted to the jury, whether or not the defendant Jones shall be able to establish his counterclaims as to transactions arising during the pre-existing partnership and prior to the incorporation, as specified in division 2 of this opinion. In the event that the defendant shall be able to establish any such counterclaims, the judgment against him would be modified accordingly. See Code, § 6-1610; Mason v. Commissioners,104 Ga. 35 (6, a) (30 S.E. 515).
With respect to the motion for new trial relating to the wife's personal liability, exceptions as to which were submitted to the jury, under the preceding rulings the evidence was insufficient to sustain a finding of personal liability on that question.
Judgment reversed in part, and affirmed in part. All theJustices concur.