**KEMIRA, INC. and California Union Insurance Company, Plaintiffs,**

v.

**A–C COMPRESSOR CORPORATION, Defendant.**

Civ. A. No. 490–016.

United States District Court, S.D. Georgia, Savannah Division.

Jan. 18, 1991.

Fred S. Clark, Savannah, Ga., for plaintiffs.

R. Nathaniel Rackett, III, and Martin Kent, Savannah, Ga., for defendant.

## ORDER

ALAIMO, District Judge.

In this diversity action, plaintiffs seek to recover indemnification for payments it made in a prior suit for injuries to defendant's employee. The alleged indemnification arises pursuant to a contract wherein Kemira, Inc. ("Kemira"), purchased the services of defendant's employee.

The case is presently before the Court on defendant's motion and plaintiffs' cross-motion for summary judgment on the issue of indemnification. For reasons discussed below, both motions will be DENIED.

FACTS

This case is a prime example of one calling for interpretation of the language of a contract. The facts, as follows, are relatively undisputed.

Kemira is a sulfuric acid plant located in Savannah, Georgia. On February 6, 1986, Kemira placed a purchase order with A–C Compressor Corporation, a Delaware corporation, for an "Allis Chalmers compressor field representative to assist the rebuild of acid plant blower." Apparently, the representative was to supervise the rebuilding of an acid plant compressor during a period

when the plant was shut down for maintenance. The purchase order expressly requested defendant to respond to the order subject to the terms and conditions stated on the reverse side of the order.

On the reverse side of the purchase order under the heading "Terms and Conditions" is a common finalization clause. It is at the top of the page and in bold print. It states:

> This document contains all terms of the parties' agreement concerning the materials or services described on the face hereof. It may not be added to, modified, or superseded except by a written instrument signed by an authorized representative of buyer [Kemira]. Different or additional terms or conditions in seller's [A–C Compressor] responses are hereby objected to and no subsequent conduct by buyer shall be deemed an acceptance hereof.

Paragraph 12 on that same page dictates the indemnification agreement, which allegedly governs this dispute. It states:

> Seller [A–C Compressor] agrees to protect, defend, indemnify and save Buyer [Kemira] harmless from and against any and all expenses, claims, demands or causes of action of every kind and character arising in favor of any person, *including employees of both Buyer and Seller*, on account of personal injuries or death, or damages to property, arising out of, incident to, or resulting directly or indirectly from the performance by Seller hereunder.

(Emphasis added.) In addition to Paragraph 12, the agreement also provides that, if defendant's employees, subcontractors or others under its control perform services on Kemira's premises, defendant will maintain and require any subcontractors to maintain insurance for workmen's compensation, employer's liability, contractor's comprehensive general liability and automobile public liability, with minimum limits as specified. The agreement further provides that, when those persons perform services on Kemira's premises, they abide by the rules and regulations of the premises and defendant keeps the materials and premises on which the work is done free and clear of all liens for material and labor incident to the performance of defendant's services.

Responding to the purchase order, defendant provided Kemira with a field representative, James H. Garrett, who was sent to Savannah to assist in the rebuilding operation.

On February 19, 1986, while supervising the work on an acid plant compressor located in Kemira's plant, James Garrett was injured. A Kemira employee opened a manhole cover above James Garrett which caused sulfuric acid to escape and spray on him. Although a warning was shouted for everyone to run, Garrett did not begin to run until after he was doused with the acid.

On March 6, 1986, defendant sent an invoice to Kemira for the services of Garrett. The reverse side of the invoice contains a general disclaimer provision. It states:

> Neither company nor its suppliers shall be liable, whether in contract or tort or under any other legal theory, for loss of use, revenue or profit, or for cost of capital or of substitute use or performance, or for incidental, indirect, or special or consequential damages, or for any other loss or cost of similar type, or for claims by Buyer for damages of Buyer's customers. Likewise, Seller shall not, under any circumstances, be liable for the fault, negligence, or wrongful acts of Buyer or Buyer's employees, or Buyer's other contractors or suppliers.

The invoice also contains a finalization clause similar to that in Kemira's purchase order.

As a result of his injuries, Garrett filed suit against Kemira on November 26, 1986, alleging that Kemira's negligence was the sole and proximate cause of his injuries. On May 19, 1989, after a trial by jury, a verdict was entered against Kemira and in favor of Garrett. The jury, in special interrogatories, attributed Kemira with 75% of the responsibility for the injuries and Garrett with 25% of the responsibility. Therefore, although final judgment was entered in the amount of $1,125,000 against Kemi-

ra, it was reduced by 25% for Garrett's negligence. The result was a final amount due of $843,750, plus court costs and with an interest rate of 9.5% per annum from May 19, 1989. Pursuant to a settlement release from all judgments, Kemira and its insurer, California Union Insurance Company, also a plaintiff in this action, made a total payment of $840,000 on June 15, 1989. Plaintiffs allegedly incurred expenses of $146,791.17 in defending the action.

Plaintiffs seek indemnification for the above costs in addition to all costs and reasonable attorney fees expended in this action. Defendant responds in its summary judgment motion with a number of contentions. First, it argues that it is not bound by the indemnity provision of the purchase order but is instead under the influence of the terms and conditions of its own March 6, 1986, invoice. Even if it is bound by the purchase order's clause, defendant continues with the argument that the clause did not explicitly indemnify Kemira for acts caused by its sole negligence. Defendant further argues that, if the provision is found to indemnify Kemira for its sole negligence, the clause is void as against public policy.

Plaintiffs counter with the allegation that the clause in the purchase order does control and does indemnify Kemira for injuries caused by its sole negligence. They further argue at this time that defendant was also negligent, because it sent Garrett to Kemira when it knew or should have known that Garrett had a prior history of respiratory ailments and that a place as dangerous as Kemira would put Garrett at an additional risk. Defendant responds that the affidavit submitted in support of this argument is technically invalid because it was based on hearsay rather than personal knowledge. Defendant adds that the allegations in the affidavit do not support a claim for defendant's negligence.

## DISCUSSION

In order to succeed on a motion for summary judgment, the movant must prove that there is no genuine issue of material fact, so that a judgment can be rendered in his favor as a matter of law. Fed.R.Civ.P.

56(e); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Because the movant bears the burden of proof, the evidence and any inferences which may be drawn from it should be viewed in the light most favorable to the non-movant. *Thrasher v. State Farm Fire & Casualty Co.*, 734 F.2d 637 (11th Cir.1984).

■ Pursuant to the principles of *Erie*, Georgia law governs this suit. *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1939). Under Georgia law, the scope of a written indemnity agreement, like any other contract, is a question of law for the Court. O.C.G.A. 13–2–1; *Molly Pitcher Canniger Co. v. Central of Georgia Railway Co.*, 149 Ga. App. 5, 253 S.E.2d 392 (1979). Under the facts of this case, it is evident that Kemira's purchase order governs the dispute. Kemira sent the purchase order to defendant, expressly stating that it represents the complete agreement of the parties. By sending Garrett to perform services under the purchase order, defendant fully accepted the order, including all of its terms and obligations. Defendant did not send the invoice for those services until after performance of the purchase order was completed. Thus, defendant's invoice cannot be controlling.

Following the above premise that Kemira's purchase order controls this dispute, two issues are presented to the Court. The first is whether the purchase order provides for indemnification for Kemira's sole negligence. If it does, then the inquiry ends there. If not, the second issue must be addressed. That issue is whether defendant was negligent in sending Garrett to Kemira to supervise the rebuilding of certain operations there. If defendant is found even partially negligent, it is required to indemnify Kemira under the terms of the purchase order.

Because the Court finds that there are issues of fact regarding the first issue— that is, whether the indemnity agreement provides solace for the indemnitee's sole

negligence—the second issue will not be addressed.[1]

■ In order for an indemnitee to be indemnified for its sole negligence under Georgia law, two requirements must be met. First, the intent to indemnify the indemnitee against its sole negligence must be expressed in plain, clear and unequivocal terms. *Brown v. Seaboard Coast Line Railroad,* 554 F.2d 1299 (5th Cir.1977). If it is not explicitly stated in the agreement, the indemnitor will not be held responsible for acts attributable to the indemnitee's own negligence. *Batson–Cook Co. v. Georgia Marble Setting Co.,* 112 Ga.App. 226, 144 S.E.2d 547 (1965); *Binswanger Glass Co. v. Beers Construction Co.,* 141 Ga.App. 715, 234 S.E.2d 363 (1977).

Second, the clause cannot be against public policy. If it is against public policy to hold the particular indemnitee harmless from its own negligence, the clause will be voided even where the terms seeking to hold the indemnitee harmless are plain, clear and unequivocal.

### I. *Is Kemira's Sole Negligence Clearly Included in the Agreement?*

■ As with most pre-printed standard contracts, contracts of indemnification are to be strictly construed against the indemnitee. *Foster v. Nix,* 173 Ga.App. 720, 327 S.E.2d 833 (1985). When interpreting the contract to divine the intent of the parties, the Georgia courts do not require the use of any talismanic words to show that the parties wanted to indemnify the indemnitee for its own negligence. The words must only be sufficiently explicit so as to evidence a clear intent to hold the indemnitee harmless from its own negligence. *Brown,* 554 F.2d at 1302; *Batson–Cook,* 112 Ga. App. at 230, 144 S.E.2d 547. Those words will, however, be closely scrutinized to discover whether such an intent exists and every presumption is against such an intention. *Batson–Cook,* 112 Ga.App. at 230, 144 S.E.2d 547.

The *Batson–Cook* case lists the circumstances a court must look at in order to determine the intent of the parties. In addition to closely examining the language of the contract itself, a court should consider the circumstances surrounding the execution of the contract, including whether the contract is standard and pre-printed, the respective bargaining powers of the two parties, whether the indemnitor was required to carry insurance and whether the indemnitee carried its own insurance. Thus, the other provisions of the contract, the parties' knowledge of liability for damages caused by negligence in such situations and the purpose of the parties in making the contract are all of concern to the Court. *Id.* at 232–234, 144 S.E.2d 547. Of course, the contract will be construed against the one preparing it. Since the contract here is a standard, pre-printed one that was prepared by Kemira, it will be construed against Kemira, as indemnitee.

On first impression, the language in the contract appears to indemnify Kemira only against the acts of defendant, whether caused in whole or in part by the defendant's negligence. Further examination reveals that the clause may indeed indemnify Kemira for acts caused by its sole negligence. As the parties have demonstrated, the addition of the words "including employees of both Buyer and Seller" may evidence an intent to indemnify Kemira for all acts of negligence, even those caused solely by Kemira.

■ As a general matter, it is apparent that, if the agreement did not contain language expressly referring to the parties' employees, the indemnification clause could not be held to indemnify Kemira for its own negligence. The Georgia courts have repeatedly held that all-inclusive terms such as "all risk of loss," "any and all losses" and "any and all liability" do not include harms caused by the sole negligence of the indemnitee. *Brown,* 554 F.2d at 1302; *Batson–Cook v. Industrial Steel Erectors,* 257 F.2d 410 (5th Cir.1958) (this

---

1. Even if the issue regarding defendant's negligence were considered, given the basic tenet that such questions are inherently for the jury, it is apparent that the issue would not be proper for determination by summary judgment.

is an area in which coverage of all does not necessarily include coverage of one of its parts) [hereinafter *"Industrial Steel"*]; *Seaboard Coast Line Railroad Co. v. Union Camp Corp.*, 145 Ga.App. 417, 243 S.E.2d 631 (1978) ("any and all losses" not sufficient); *Georgia State Telephone Co. v. Scarboro*, 148 Ga.App. 390, 251 S.E.2d 309 (1978) (indemnification against "all claims" to "any person" held to be insufficient). Such language is too broad and does not clearly evidence the requisite intent needed to provide indemnification against the indemnitee's own negligence.

Moreover, if the clause in this case contained only a reference to "any person" without the inclusion of the employees, the language would similarly be insufficiently explicit. Such broad language only defines the scope of the indemnity, or the area in which it applies, not the legal reach of the clause once it is found to apply. Rather than specifically identifying who might sue, the phrase merely points out that there are many situations other than the negligence of the indemnitee to which the clause might apply. *See Batson–Cook*, 112 Ga.App. at 230, 144 S.E.2d 547; *Industrial Steel*, 257 F.2d at 413. Without further specification, a court will not read into the general provision an intention to indemnify for the indemnitee's negligent acts.

■ The importance of the words "including employees of both Buyer and Seller" was brought to the Court's attention by plaintiffs through their submission of a District of Columbia Circuit opinion, *Moses–Ecco Co. v. Roscoe–Ajax Corporation*, 320 F.2d 685 (D.C.Cir.1963). The indemnification provision in that case, similar to the one here, stated that:

The Subcontractor [Moses–Ecco] agrees in the performance of this contract * * * that he will at all times indemnify and save harmless the Owner and the Contractor [Roscoe–Ajax] against any loss, because of injury or damage to persons or property arising or resulting from the performance of this contract, *including* any and all loss, cost, damage or expense which the Owner and/or Contractor may sustain or incur on account of *any*

*claim,* demand or suit made or brought against them or either of them *by or on behalf of any employees of [Moses–Ecco]* * * *.

*Moses–Ecco*, 320 F.2d at 687 (emphasis added).

Although the provision did not specifically include losses incurred through the indemnitee's own negligence, the court held that the intent to cover such losses was otherwise plainly clear from the language in the agreement. The *Moses–Ecco* court apparently relied on the broadness of the provision in its conclusion, but this broadness was in reference to the idea that "all" losses on "any" claims included those of Moses–Ecco's employees. Stating that it was difficult to conceive of any broader phraseology, the court pointed out that further specification would be superfluous and ritualistic. The court further pointed out that no valid claim by an employee of Moses–Ecco could arise against Roscoe–Ajax except through Roscoe–Ajax's own negligence. Based on this premise, the court reasoned that excluding losses caused by Roscoe–Ajax's negligence would deprive the clause referring to Moses–Ecco's employees of "virtually the only meaning it can possibly have." *Id.* at 688.

In a footnote, the *Moses–Ecco* court distinguished *Industrial Steel*. While recognizing that *Industrial Steel* interpreted a similar provision to exclude recovery for losses caused by the indemnitee's own negligence, the court noted, however, that the clause in *Industrial Steel* did not contain a specific reference to claims brought by employees of the indemnitor. *Id.* at 688 n. 2. Reference to this distinction was made and seemingly approved in *Batson–Cook* during a discussion of the *Industrial Steel* case. For the proposition that *Industrial Steel* has been followed, distinguished and questioned, the *Batson–Cook* court cited *Moses–Ecco*. The court stated that *Moses–Ecco* reached an opposite conclusion to *Industrial Steel* while construing a similar provision by distinguishing the cases through the fact that only *Moses–Ecco* contained a specific reference to claims brought by employees of the indemnitor.

*Batson–Cook*, 112 Ga.App. at 231, 144 S.E.2d 547. Thus, it would appear that such a specification would also be appropriate in Georgia when parties desired to indemnify the indemnitee against his own negligence.

Such an interpretation seems to have support from the remainder of the Georgia case law. From the Georgia cases that include language regarding employees of either party, an inference can be drawn that such specification does affect the intent of parties. For example, in *Nat'l. Candy Wholesalers, Inc. v. Chipurnoi, Inc.*, 180 Ga.App. 664, 350 S.E.2d 303 (1986), the court held that an indemnity agreement concerning claims brought by the indemnitor's employees necessarily included actions based on the sole negligence of the indemnitee.

The indemnity agreement in the *Chipurnoi* case specifically addressed claims brought by the employees or agents of the indemnitors. In fact, it provided indemnity only for such claims; there was an absence of any broad language regarding claims brought by "any person."[2] When an employee of an exhibitor was injured and sued NCWA claiming that the association's negligence was the sole proximate cause of his injury, the court found that the agreement sought to indemnify NCWA from "any and all claims (which necessarily includes claims emanating from injuries caused solely by NCWA's negligence) made by any employee or agent of the exhibitor." *Chipurnoi*, 180 Ga.App. at 666–667, 350 S.E.2d 303. Although the court then found that such a provision was against public policy, the proposition that the words in the agreement were sufficient to indemnify the indemnitee against claims arising from its sole negligence still has merit. It appears that the court must have considered the employee language as part of the reason why the agreement "necessarily included" claims arising from NCWA's sole negligence—even though, in the court's analysis, the exact reasoning was placed between the words "any and all claims" and "made by any employee."

Further, in both *Stafford Enterprises v. American Cyanamid Co.*, 164 Ga.App. 646, 297 S.E.2d 307 (1982), and *Charter Builders, Inc. v. Sims Crane Service, Inc.*, 150 Ga.App. 100, 256 S.E.2d 678 (1979), the indemnity agreements included employee language.[3] Both agreements also provided, however, that the indemnitors would not be liable for damages caused by the sole negligence of the indemnitees. Because both cases included express provisions *not* to hold the indemnitors responsible for the indemnitees' sole negligence, one can infer that, if the language were not present, a Georgia court would hold that the parties expressed an intent to make the indemnitor liable for such negligence.[4]

---

2. The agreement provided:

   NCWA [indemnitee] ... will not be responsible for the safety of the persons or property of the exhibitor [indemnitor], his agents or employees from injury ... and will be indemnified and saved harmless by the exhibitor from any claim by any of the exhibitor's agents or employees from injury, loss, or damage.

   The underlying contract involved the lease of NCWA's premises to Chipurnoi and other candy sellers for a "candy exhibit." In an effort to find the agreement void as against public policy, the court focused on finding that the agreement provided for indemnification against NCWA's sole negligence.

3. In *Charter*, the indemnitor agreed to indemnify the indemnitee for all claims for death or injury to persons, including indemnitee's employees, arising in any manner out of indemnitor's operation. The agreement also provided, however, that the indemnitor would not be required to indemnify the indemnitee for the indemnitee's sole negligence. *Charter*, 150 Ga. App. at 100, 256 S.E.2d 678.

   Similarly, in *Stafford*, the indemnitor agreed to indemnify the indemnitee for any losses suffered by the parties and/or their employees resulting from the performance by the indemnitor. That agreement also provided that the indemnitor would not be liable for damages caused by the sole negligence of the indemnitee. *Stafford*, 164 Ga.App. at 648–49, 297 S.E.2d 307.

4. *Stafford* also included language in which the indemnitor was responsible for a loss "whether such loss ... is *contributed* to by the negligence of Cyanamid [indemnitor] or its employees ... or the premises themselves ... or any equipment thereon...." *Stafford*, 164 Ga.App. at 648–49, 297 S.E.2d 307 (emphasis added). Such language has been held by itself to impose liability upon an indemnitor for the sole negligence of the indemnitee.

This, however, could be reading too much into a broad indemnity agreement, an action which is prohibited by the Georgia courts. Perhaps they would instead require even more explicit language to hold the indemnitor liable.

Apparently, that is what defendant believes the Georgia courts would do. Defendant points the Court to two Georgia cases in which the applicable agreements explicitly referred to the sole negligence of the indemnitee. *See Kraft Foods v. Disheroon,* 118 Ga.App. 632, 165 S.E.2d 189 (1968); *Redfern Meats, Inc. v. Hertz Corp.,* 134 Ga.App. 381, 215 S.E.2d 10 (1975). In both of those cases, the indemnitors agreed to indemnify the indemnitees from all claims "whether or not" due to the negligence of the indemnitor. *Kraft,* 118 Ga. App. at 632, 165 S.E.2d 189 (contractor [indemnitor] agreed to indemnify "whether or not due in whole or part to negligence of" the owner [indemnitee] or the architect); *Redfern Meats,* 134 Ga.App. at 381, 215 S.E.2d 10 (indemnitee not responsible for damage to any property "whether or not due to the negligence of" the indemnitee, its agents or employees).

Because no such language is present here, defendant argues that the purchase order does not clearly and unequivocally require defendant to indemnify Kemira for Kemira's negligence, where the defendant was not also negligent. Such an interpretation would contravene the laws of Georgia even more so than reading the employee language as the Court did above—as indicating an intent to indemnify against the indemnitee's sole negligence. Although the intent must be plain, clear and unequivocal, the words evidencing that intent need not be talismanic. To require each agreement to contain the words "whether or not due to the negligence of the indemnitor or indemnitee" would, indeed, be talismanic.

This conclusion is supported by other cases involving indemnity agreements that not only refer to claims brought by the parties' employees but, additionally, contain some stronger indication of intent. For example, *Eastern Air Lines, Inc. v.*

*C.R.A. Transportation Co., Inc.,* 167 Ga. App. 16, 306 S.E.2d 27 (1983), involved an indemnification clause which obligated the indemnitor to indemnify the indemnitee against all claims arising out of the agreement including, but not limited to, claims of employees of the indemnitor and indemnitee. The clause further provided that the indemnification did not apply to any claims arising out of the gross negligence or willful misconduct of the indemnitee. Ignoring the reference to the employees of the parties, the court focused on the phrase excepting the indemnitor from liabilities arising out of incidents due to the indemnitee's gross negligence or willful misconduct. The court reasoned that the indemnity provision, when read as a whole, was intended to require the indemnification of the indemnitee for all liability arising from the agreement, with the exception of the indemnitee's gross negligence or willful misconduct. Since all provisions in a contract are presumed to be inserted for a purpose, and thereby are to be given some meaning, the court refused to give the "gross negligence and willful misconduct" phrase an interpretation that would render it useless and meaningless. By providing this express "gross negligence and willful misconduct" limitation, the parties' intention to cover liability arising from the indemnitee's plain negligence was demonstrated. *Eastern Air Lines,* 167 Ga.App. at 17–18, 306 S.E.2d 27. *See also Colonial Stores, Inc. v. Central of Georgia Railway Co.,* 279 F.2d 777 (5th Cir.1960) (question of indemnification for indemnitee's sole negligence not addressed because indemnitor was found by lower court to be concurrently negligent).

Similarly, agreements which provide indemnification for a particular act have been held to impose liability on an indemnitor, even when the act was performed through the sole negligence of the indemnitee. *See Brown,* 554 F.2d at 1299; *Louisville & Nashville Railroad Co. v. Atlantic Co.,* 66 Ga.App. 791, 19 S.E.2d 364 (1942) [hereinafter *"L. & N.R. Co."*]. The *L. & N.R. Co.* case involved an indemnity agreement containing a reference to the parties' employees in addition to a phrase regarding the

specific harm indemnified against. Although the court paid primary attention to the specific harm phrase, it did seem to recognize additionally the importance of the employee reference.

Essentially, the indemnitor in that case agreed to indemnify the indemnitee against all claims for injuries to the indemnitor, or the indemnitor's employees, agents or others (but not the employees of the indemnitee) when those persons were injured due to the construction or maintenance of the railroad track in question or the operation of locomotives on the track. The court reasoned that, if the indemnitee (the railroad company) were not indemnified for its own negligence, the use of phrases regarding the track and locomotives would be useless. Since the indemnity clause provided for indemnity against any claim for personal injuries to certain persons when upon the track or in connection with the operation of the locomotives, given the parties' relationship, no other kind of claim than one based on the indemnitee's negligence could be brought. *L. & N.R. Co.*, 66 Ga. App. at 800, 19 S.E.2d 364.

To enforce this proposition, the *L. & N.R. Co.* court cited *Cacey v. Virginian Railway Co.*, 85 F.2d 976 (4th Cir.1936), which involved an indemnification against claims brought by either parties' employees by reason of the use of the indemnitee's railway property. Permitting indemnification of the indemnitee's own negligence, the court emphasized that, if the language of the agreement did not intend such a meaning, then the words would mean nothing. Without such indemnification, there would be no other class of claims that could be brought against the railway company for which it would be indemnified. *Cacey*, 85 F.2d at 978. Since both *L. & N.R. Co.* and *Cacey* involved suits by employees of the indemnitor, it is fitting to assume that the courts factored into their analyses the agreements' specific references to those employees. After all, the courts held that no other claims but those for the indemnitee's sole negligence could be brought against the indemnitee by those employees.

Although the Court realizes that an intent to indemnify for one's own negligence should be explicitly stated in the agreement and not inferred by implication, it also notes that, without implication, the meaning of some phrases will often not be given the proper effect. Although not involving an indemnity clause which included language of employee causes of action, the court in *Bohannon v. Southern Railway Co.*, 97 Ga.App. 849, 104 S.E.2d 603 (1958), cited an Eighth Circuit opinion to propose the rule that, when a party seeks to indemnify itself from the consequences of its own negligence, it must do so in unequivocal terms. The case cited by the court was *Kansas City Southern Railway Co. v. New England Fire Insurance Co.*, 133 F.2d 973 (8th Cir.1943).

The indemnity agreement in *Kansas City* provided that the Railway Company would be saved harmless by its lessee from all claims for injury to the Railway Company's employees or property, "or to other persons or their property," in consequence of the occupancy of the leased premises by the lessee. The lessee sued the Railway Company for fire loss to its property caused by the Railway Company's negligence. The Railway Company tried to read the phrase "to other persons or their property" as including claims by the lessee so that it would be indemnified against its negligence to the lessee. The court disagreed and held that, if the Railway Company wanted to protect itself from liability to the lessee for damage it negligently caused, it would have provided as much. *Kansas City*, 133 F.2d at 976.

The court in *Kansas City* distinguished the case before it from the *Cacey* case. Since the indemnity agreement in *Cacey* involved claims brought by employees of *either* of the parties and the agreement in *Kansas City* only applied to claims brought by the indemnitee's employees, the importance of the use of such language to make one responsible for another's sole negligence is given more credence. However, these cases did not simply base their decisions on the language in the applicable indemnity agreements. They also considered the circumstances surrounding the

agreements and the purposes behind the agreements. For example, the lease in the *Cacey* case was primarily for the benefit of the indemnitor-lessee, since the only consideration paid for the use of the railway property was $1.00 a year. Therefore, the indemnity agreement was intended to protect the indemnitee-railway company from loss due to the use of the property by the lessee or others. Because the use of the railway was considered to be an "act of grace" by the railway company, the court concluded that an intent to indemnify against even the railway company's sole negligence was evident. *Cacey*, 85 F.2d at 976.

Not only was the language in *Kansas City* different, so was the purpose behind the agreement. Unlike the railway company in *Cacey*, the company in *Kansas City* did stand to receive a substantial benefit from the agreement; and so, the court reasoned that it would be more likely to accept the risk of loss caused by its own negligence. *Kansas City*, 133 F.2d at 976. Although the agreement in *Kansas City* did not refer to the indemnitor's employees, there is case law with such language where it has been held that the indemnitee was not indemnified against its sole negligence based on the circumstances of the contract. *See Perry v. Payne*, 217 Pa. 252, 66 A. 553 (1907).

The court in *Perry* refused to allow the indemnitee to be indemnified for its own acts of negligence for fear that it would turn the indemnitor into an insurer. At that time, any assumption of liability due to the sole negligence of another was contrary to experience and, thus, unanticipated by the parties. *Perry*, 217 Pa. at 259, 66 A. 553. To have held otherwise would have been completely unfair to the parties. Although the *Perry* case remains in effect today, and in fact led the way for most of the Pennsylvania decisions regarding indemnity, even the recent Pennsylvania decisions recognize its timeliness. Today, more and more contracts of indemnity are present, and the inclusion of protection

against one's own negligence is a growing part of the practice.

What effect do the circumstances of the execution of the contract here have on its interpretation? That is a difficult question to answer. As a pre-printed standard contract, the indemnity clause should be construed against Kemira. However, both parties are of equal bargaining power, and defendant could have easily ensured that it would not be responsible for damages caused by Kemira's sole negligence. There is also no evidence of one party getting more of a benefit from the agreement— Kemira is simply obtaining services for which it is fairly paying.

The other provisions of the agreement read equally against and for indemnification for Kemira's sole negligence. Defendant was required to take out insurance to protect itself.[5] Such a requirement, coupled with the fact of an indemnitee taking out insurance, which Kemira obviously did here, has been shown to indicate an intent not to indemnify the indemnitee for its own negligence. *See Batson–Cook*, 112 Ga. App. at 234, 144 S.E.2d 547 (indemnitor required to carry insurance of the kind which ordinarily provides coverage for damages caused as a result of his own negligence and indemnitee itself carried liability insurance). While not conclusive, such action at least indicates an intent on the part of the indemnitee to be prepared for liability arising out of its own acts of negligence without relying solely on the indemnity agreement.

However, the indemnity agreement favors holding defendant responsible for Kemira's sole negligence in that it shows a special concern on behalf of Kemira to ensure that, when defendant's employees or agents are on its premises, they follow its rules and regulations. In conjunction with the requirement that defendant keep the materials and the premises on which the work is done free and clear of all liens, the above assurance tends to show that Kemira

---

**5.** It should be noted that this requirement is different from requiring the indemnitor to take out insurance on behalf of the indemnitee.

Such a requirement would change the contract from one of indemnification to one of insurance.

intended for defendant to take on extra responsibility whenever its employees or agents were on Kemira's property.

Perhaps the most difficult task in ascertaining the intent of the parties in this agreement is in the determination of what effect should be given to the apparent inconsistencies in the language of the clause itself. While purporting to hold defendant responsible only for liabilities arising out of its performance of the contract, Kemira slipped in a clause in which actions brought by employees of either party were to be included as indemnifiable acts. The problems that can develop from such an inconsistency can be clearly seen when this contract is compared with the one present in *Capozziello v. Brasileiro*, 443 F.2d 1155 (2d Cir.1971).

The court in *Capozziello* divided the indemnity agreement into two parts to demonstrate the two types of actions for which the indemnitor would be liable. As a whole, the indemnitor agreed to indemnify the indemnitee against:

> any loss ... to persons ... arising or resulting from the performance of this contract, including any ... loss which the [indemnitee] may sustain ... on account of any claim ... brought ... on behalf of any employee of [indemnitor], or by the [indemnitor], his servants, agents or employees, or in case of any claim being made ... for any act ... of the [indemnitor] resulting in injury or damage to persons or property.

*Capozziello*, 443 F.2d at 1157.

The first part of the agreement specified responsibility for any claim, even those due to the sole negligence of the indemnitee, because it provided for indemnity for any loss sustained by any employee or agent of indemnitor arising under the performance of the contract. Following *Moses–Ecco*, that would necessarily include the negligent acts of the indemnitee. The second part of the agreement specified liability on behalf of the indemnitor for any claim made because of any act of the *indemnitor* which resulted in an injury to any person. This was held to apply only to actions brought by third parties not employed by

the indemnitor and was limited to injuries resulting only from the negligence of the indemnitor. *Capozziello*, 443 F.2d at 1158–59.

Thus, this Court is presented with a problem. What effect, if any, does the distinction between the two parts of the indemnity clause identified in *Capozziello* have on the agreement here? Would it be inconsistent here to hold that the inclusion of the employee language permits indemnification for injuries caused by Kemira's sole negligence while, at the same time, providing for indemnification for injuries caused by acts arising under defendant's performance of the contract? Given the language in this agreement and the circumstances underlying the execution of the agreement, this Court finds that any inconsistencies which may appear from the language are *de minimis*.

The Court recognizes that each agreement must be analyzed on the facts of each particular case. Therefore, in conformity with the applicable case law and the facts of this case, it is evident that the language concerning the parties' employees would not have been included if it was not for some purpose. Since the clause left room for all acts arising *directly or indirectly* from defendant's performance under the contract, it is clear that the intention of the parties was to include acts arising solely from the negligence of Kemira. Otherwise, the use of the employee language would be meaningless, since an employee of defendant may have no other course of action against Kemira except through Kemira's sole negligence.

II. *Is the Indemnification of Kemira's Sole Negligence Against Public Policy?*

■ The answer to this question is one of fact for the jury. In order to hold an indemnification provision void as against public policy, even though it plainly and clearly seeks to indemnify against the indemnitee's sole negligence, two threshold conditions must be met. First, the agreement must pertain to the maintenance or construction of a building. Second, the in-

demnity clause must purport to indemnify the promisee against the consequences of his sole negligence. *See Nat'l. Candy Wholesalers, Inc. v. Chipurnoi, Inc.*, 180 Ga.App. 664, 350 S.E.2d 303 (1986).

The most common types of agreements held to be against public policy are those between contractors and subcontractors, since they necessarily involve the maintenance or construction of buildings or other structures. Thus, those agreements are held to be against public policy when the indemnitor indemnifies against the indemnitee's sole acts of negligence. Georgia courts have also held similar exculpatory clauses invalid when they were part of a lease arrangement. *See Chipurnoi*, 180 Ga.App at 664, 350 S.E.2d 303.

This policy derives from O.C.G.A. § 13–8–2(b), which provides:

> An ... agreement ... relative to the construction, alteration, repair, or maintenance of a building structure, appurtenances, and appliances, including moving, demolition, and excavating connected herewith, purporting to indemnify or hold harmless the promisee against liability for damages arising out of bodily injury to persons or damage to property caused by or resulting from the sole negligence of the promisee, his agents or employees, or indemnitee is against public policy and is void and unenforceable, provided that this subsection shall not affect the validity of any insurance contract, workers' compensation, or agreement issued by an admitted insurer.

Here, defendant alleges that, even if the agreement provides for indemnification against Kemira's own negligence, it is against public policy. Since James Garrett was injured while supervising work on a compressor located in Kemira's plant, defendant argues that the purchase order is relative to the repair or maintenance of a building, structure or appliance contained in that building or structure. As such, any provision attempting to indemnify Kemira for injuries caused by its own acts of negligence should be held void as against public policy.

Unfortunately, the allegations that this agreement is relative to the repair or maintenance of a building or structure go no further than what is alleged in defendant's brief. The contract does not itself purport to identify exactly what relationship the employee's services will have to the maintenance or repair of Kemira's plant, nor do the circumstances surrounding the agreement give a clear picture as to this intent. As such, the Court finds that it is for the jury to decide whether the contract in question here was relative to the maintenance, construction or repair of a building or structure so as to hold that part of the agreement indemnifying Kemira for its sole acts of negligence void as against public policy.

CONCLUSION

Upon due consideration of both parties' motions for summary judgment, the Court concludes that the contract in question does indemnify Kemira for injuries caused by its sole negligence. However, the question of whether the contract is relative to the maintenance of a building or structure so as to render the indemnity provision void as against public policy is one for the jury. Because the Court finds sufficient evidence to go to the jury on the question of indemnification for Kemira's sole negligence, the issues regarding any negligence on the part of defendant will not be addressed. This Order, therefore, does not prevent the admission of such evidence at trial.

Accordingly, the parties' motions for summary judgment are DENIED.

SO ORDERED.