68976. FOSTER et al. v. NIX.
(327 SE2d 833)

BEASLEY, Judge.

Dr. Gerald Nix brought a suit seeking to recover under the terms of an indemnity agreement against Wayne and Patricia Foster. The defendants answered the claim, setting up various defenses and subsequently by amendment added other defenses. During the pretrial interim, both sides conducted extensive discovery and various motions were filed and ruled upon.

The case was tried before a jury which returned a verdict for the plaintiff in the principal amount sought, $48,012.70, plus attorney fees. Judgment was duly entered thereon and the defendants, whose motions for directed verdict made at the close of plaintiff's evidence and at the close of all the evidence had been denied, appeal to this court.

The facts out of which this controversy arose are basically as follows.

Upon learning that Reeves Hardware and Furniture in Clarkesville, Georgia, was offering its motorcycle and marine business for sale, Nix and Eugene Boyd decided to purchase the dealership. Boyd recommended to Nix that Wayne Foster be brought into the enterprise.

In order to carry out the purposes of the business, a corporation was to be formed which would be styled acronymically NaBaF, Inc., a combination of the first initials of the names Nix, Boyd and Foster. At first, Nix was to hold a bare majority of the stock with Boyd the minority shareholder, but then Boyd and Foster were to divide the minority shares equally. Subsequently, as a result of his own em-

ployer's ultimatum, Boyd withdrew entirely. Thus, it was finally proposed that Nix, the supplier of the necessary finances, would have 51% of the stock and Foster, the provider of direct day-to-day management of the business, would receive 49% of the shares.

While the internal composition of the proposed corporation was progressing, Nix borrowed $30,000 from First National Bank of Habersham County for the purpose of depositing earnest money for the sale with Reeves Hardware. Then on October 7, 1974, Nix executed as "Dr. E. Gerald Nix d/b/a NaBaF" a promissory note for $150,000 with First National. The maturity date of the note was October 7, 1975. The proceeds from this loan were deposited in a bank checking account under Nix's name "d/b/a NaBaF." Subsequently, this account became the corporate bank account. Foster was authorized to and did write checks on the account. During the month of October 1974 before NaBaF, Inc., was formally incorporated, Nix wrote a check for $30,684.80 which paid off his loan of $30,000 from the bank and Foster wrote two checks of $64,629.09 (October 14, 1974) and $42,764.14 (October 19, 1974) to Reeves Hardware for inventory and equipment. These payments were made pursuant to a sales agreement entered into between Nix and Reeves Hardware on October 10, 1974. The details of the agreement were more fully spelled out in a subsequent "agreement for sale of businesses" between Reeves Hardware and NaBaF, Inc., dated October 31, 1974, and referenced in the October 10 agreement.

The record reveals NaBaF, Inc., was incorporated under the laws of Georgia by the Hall Superior Court on October 31, 1974, and the Secretary of State's certificate attesting to such fact issued on November 1, 1974.[1]

On October 31, 1974, Foster, his wife and Nix entered into an indemnification agreement which recited: that the Fosters desire that NaBaF, Inc., obtain a loan from First National in the amount of $150,000 but the bank has refused to make such loan without the personal guaranty of Nix; that the Fosters have requested Nix to guarantee the loan, but he is unwilling to do so unless the Fosters execute the agreement. The terms of the agreement were that in consideration of Nix delivering to First National a personal guaranty of the $150,000 loan made by the bank to NaBaF, Inc., the Fosters covenanted: "(a) To save and hold harmless [Nix] from any and all liability and/or claims and/or damages and/or expenses (including attor-

---

[1] The corporate code of 1968 as amended, former Code Ann. § 22-803, provided that the corporate existence began with the time of filing the documents of incorporation and the superior court judge's order approving the incorporation with the clerk of the superior court. However, the corporation was not authorized to transact business until it received the certificate from the Secretary of State. Ga. L. 1968, pp. 565, 652.

neys' and counsel fees) and/or losses that [Nix] may sustain, or become liable or answerable for, or shall pay, upon, or in consequence of, such loan guaranty, or any renewal or extension thereof; (b) That the vouchers, or other proper evidence, showing payment by [Nix] of any such liability and/or claim and/or damages and/or expenses (including attorneys' and counsel fees) shall be conclusive evidence against the [Fosters] of the fact and amount of the liability of the [Fosters] to [Nix]."

By instrument dated November 10, 1974, NaBaF, Inc., executed a $150,000 promissory note with a maturity date of October 7, 1975, to First National. The note was secured by Nix's property, which had been used to secure his previous note for $150,000, plus inventory and equipment of the corporate business. The signatories to the note were Nix as president of NaBaF, Inc., and Foster as secretary. A typed entry on top of the promissory note reads: "replaces note of Dr. E. Gerald Nix, d/b/a NaBaF dated October 7, 1974." Concurrent with the note, Nix in his individual capacity executed a guaranty agreement with First National. On the face of the $150,000 promissory note of October 7, 1974, given by Nix in his individual capacity is the handwritten message: "This loan replaced this 5th day of April, 1975 by loan to NaBaF, Inc. This is not a paid nor cancelled loan." There was no specific showing as to when this memorandum was made.

November 4, 1974, is the date listed for the director's consent for an organization meeting of NaBaF, Inc., whereat the articles of incorporation were approved, the bylaws were adopted, officers elected, forms of seal and share certificates adopted; also approved were the form and plan of the subscription of shares, the opening of a bank account, etc.

On December 14, 1974, the corporation's joint meeting of directors and shareholders recognized that Eugene Boyd had declined participation in the corporation and had resigned as a director. Foster and his wife were elected to the board of directors.

During the trial a serious issue was raised regarding whether many of the documents were actually executed on the dates given on such documents. Two letters from counsel involved in the incorporation of NaBaF, Inc., to Nix which were written in January 1975 tended to show that the sales agreement between NaBaF, Inc., and Reeves Hardware was not yet finalized and likewise with regard to several of the instruments involving the corporate formation documentation. Foster also testified that his address specified on the October 31, 1974, agreement of indemnification was that of a house he did not purchase until December of that year. Also, there is a note of May 11, 1976, from an individual who did bookkeeping for NaBaF, Inc., which pointed out there was no entry indicating either Nix or Foster

had paid for their shares under the stock subscription agreement.[2]

Therefore we use these dates as a means of identification without in any way intimating that such dates were conclusively established by the proof.

On October 4, 1975, there issued a promissory note from NaBaF, Inc., to First National. It had a face amount of $150,000, provided for monthly payments, and was secured by Nix's property previously listed in the other two notes for the same amount plus inventory and equipment of NaBaF. This note was listed as "renewal" and under "cash proceeds" referred to "R#23999" the customer number of Nix's October 7, 1974, $150,000 promissory note. Nix executed the note as President of NaBaF, Inc., and also executed the guaranty of payment provision of such note in his individual capacity. Foster signed the note as secretary of NaBaF, Inc.

The business of the corporation did not flourish and it began to flounder financially. As conditions worsened, unavailing efforts were made to find a purchaser for the business. The minutes of the corporation of November 1977 show a resolution to sell the corporate property and assets in order to pay off the outstanding liabilities of NaBaF, Inc. In December 1977 at another corporate meeting the two Fosters were removed from the board of directors.

On March 3, 1978, pursuant to Nix's offer, the corporation sold him its business and assets for $73,170.51, the total listed amount of its inventory, equipment and parts. Although the corporation operated both a motorcycle and a boat dealership and had paid $1,000 for good will and $29,000 for a covenant not to compete with Reeves Hardware, it received nothing for these items under its sales agreement with Nix.

On April 3, 1978, attorneys for First National wrote Nix that the corporation's promissory note dated October 4, 1975, was in default and the bank demanded payment of Nix as the personal guarantor thereof. Since NaBaF, Inc., paid $78,067.93 of the total amount owing of $126,080.63, Nix was required to pay off only the balance of $48,012.70. After paying that amount, Nix sought recovery of such sum from the two Fosters under the terms of the agreement of indemnification which they executed dated October 31, 1974. The refusal to meet this demand culminated in the instant action being brought by Nix. *Held*:

1. In our discussion of the legal principles pertinent to the facts

---

[2] At that time, as now, then Code Ann. § 22-805 (now OCGA § 14-2-174) provided: "A corporation shall not transact any business or incur any indebtedness, except such as shall be incidental to its organization or to obtaining subscriptions for or payment for its shares, until there has been paid in the minimum consideration for the issuance of shares fixed in the articles of incorporation." Ga. L. 1968, pp. 565, 653.

of this case the promissory notes involved shall be referred to respectively as note 1 (October 7, 1974), note 2 (November 10, 1974) and note 3 (October 4, 1975).

The defendants, in support of their contention that the evidence demanded a verdict in their favor, raise four issues.

Did the indemnity agreement extend to any loan except one between the corporation and the bank?

Did the indemnity agreement extend to an original undertaking rather than a substitution, assumption or renewal of the original undertaking?

Was the instrument given by the corporation to the bank a "renewal," and if so, where the original note between the bank and Nix was not extinguished, did the corporation obtain a loan in terms of the indemnity agreement?

Was the corporation merely a party secondarily liable to the bank behind the original obligation signed individually by Nix which was not canceled and, if so, did the indemnity agreement contemplate such a transaction?

The defendants urge the well-established rule that the construction of a contract, even an ambiguous one, is for the court. *American Cas. Co. v. Crain-Daly Volkswagen*, 129 Ga. App. 576, 579 (200 SE2d 281) (1973). We note that only after all the applicable rules of construction are exhausted is a jury question presented. *Hamilton v. Truelove*, 148 Ga. App. 116, 119 (250 SE2d 864) (1978). We also recognize the familiar principles that regarding contracts of indemnity the agreement is construed strictly against the indemnitee and that any ambiguous provision must be construed against the party who drew it. *Scarboro Enterprises, Inc. v. Hirsh*, 119 Ga. App. 866 (169 SE2d 182) (1969); *U. S. A., Inc. v. Kirkland*, 142 Ga. App. 484 (236 SE2d 130) (1977).

Nevertheless, " 'The cardinal rule of construction, to which all others are subordinate, is to ascertain the intention of the parties, and in order to do this the language of the agreement should be considered in the light of the attendant and surrounding circumstances. The court should place itself as nearly as possible in the situation of the parties, in seeking the true meaning and correct application of the language of the contract.' " *Aetna Life Ins. Co. v. Padgett*, 49 Ga. App. 666, 669 (176 SE 702) (1934). Accord *Jarmon v. Hinson*, 166 Ga. App. 890 (305 SE2d 484) (1983). In applying this paramount principle "irrespective of all technical or arbitrary rules of construction" (see OCGA § 13-2-3), we find no basis to reverse the judgment entered on the jury verdict.

(a) It is argued, on behalf of the defendants, that there was no loan, as defined by such cases as *McLendon v. Johnson*, 71 Ga. App. 424, 428 (31 SE2d 89) (1944), made by the bank to the corporation.

While it is conceded by defendants that the four necessary elements were present in note 1, it is contended that a vital part was missing as to notes 2 and 3 in that there was no sum placed with the borrower. Were not this view so earnestly pressed we would be inclined to give it short shrift. Nevertheless, it is clear that the corporation did receive a "sum," for the money from note 1 was utilized to purchase the inventory and the business including the tangible and intangible assets thereof, all of which benefits the corporation received and utilized in carrying out its purpose as set forth in its charter.

Without question, "[a] corporation which lawfully acquires the property of a partnership does not thereby become liable for the partnership's debts." *Culberson v. Ala. Constr. Co.*, 127 Ga. 599, 609 (56 SE 765) (1907). In order to create liability " 'the same formalities are required as to make any individual liable for the debts of another.' " *Taylor Lumber Co. v. Clark Lumber Co.*, 33 Ga. App. 815 (1) (127 SE 905) (1925).

However, one must not overlook the very important exception to such rule which first found expression in the landmark case that is the basis for the principal rule, *Georgia Co. v. Castleberry*, 43 Ga. 187, 189 (1871). This court cited that case in a lucid summation of the relevant principles and held: "A corporation, though of the same name as a partnership transacting the same business prior to the act of incorporation, is not the same person; and to make it liable for a debt due by the partnership, there must be a writing signed by the party (corporation) to be charged therewith . . . or it must be shown that the corporation received the consideration for which the indebtedness was incurred." *Bludwine Bottling Co. v. Crown Cork & Seal Co.*, 14 Ga. App. 285 (1) (80 SE 853) (1914).

Even where the corporate officers acted outside the scope of their authority, if the corporation receives a valuable benefit, the actions of the corporation may serve to ratify such unauthorized acts. *Builders Homes v. Wallace Pump &c. Co.*, 128 Ga. App. 779, 782 (5) (197 SE2d 839) (1973).

Here the corporation entered into the purchase agreement with Reeves Hardware on October 31, 1974, payment for which had been accomplished by the proceeds of note 1. The corporation began operation with the inventory and assets it obtained and on November 10, 1974, pledged these assets on note 2 which was for the same principal amount as note 1 and, according to the notation thereon, replaced note 2. Note 3, an installment loan with periodic payments, replaced note 2 and with reference to "cash proceeds" contained the account number for note 1. The corporation made payments on note 3 for over two years before defaulting. The two defendants were directors of the corporation as well as employees. As such, they are in no position to assert that the corporation did not observe all the technical

formalities of memoralizing the assumption of indebtedness and must be considered knowledgeable as to the history and utilization of the proceeds of the loan.

Where a question arose as to whether partners could follow debts owed then by the partnership into the corporation which absorbed the partnership assets, the Supreme Court held: "when the partners by mutual agreement between themselves transferred the entire assets of the partnership into a solvent corporation wherein it was merged, it must be taken that as between themselves, and acting for themselves, it was intended that the corporation would take over the assets *cum onere* insofar as pertained to partnership debts owing to its own members." *Jones v. J.S.H. Co.*, 199 Ga. 755, 771 (35 SE2d 288) (1945).

In making a distinction between corporations *de jure* and those *de facto* the Supreme Court noted with reference to *de facto* corporations "where the corporators have assumed to act under a corporate name, they cannot by reason of informalities in the execution of corporate powers escape liability for corporate acts . . ." *Rau v. Union Paper Mill Co.*, 95 Ga. 208, 213 (22 SE 146) (1894). For a similar expression see *Stewart Paper Co. v. Rau*, 92 Ga. 511 (17 SE 748) (1893) where it was said with regard to those who incorporated under a partnership business name and carried out the business under the same name and at the same place "they will not be heard to deny the existence of the corporation, as against a creditor . . ."

In brief, there is a valid basis for holding that the defendants may not raise technical objections regarding either the incorporation, the taking over the loan or the acquiring of the assets by the corporation as a basis for nonliability under the agreement, particularly when they contributed to the absence of the technical completeness. Moreover, the fact that the bank did not "cancel" note 1 but rather marked it "replaced" clearly shows that the subsequent notes 2 and 3 were substitutes for it. The debt had not been extinguished, so of course note 1 could not be marked "paid" or "canceled." There was never any question that only one principal sum ($150,000) was owed the bank which eventually was included in note 3. There was evidence to sustain a finding that there was a loan to the corporation within the meaning of the indemnity agreement.

(b) It is contended on behalf of the Fosters that no obligation was owed under the indemnity because Nix was not liable as a guarantor but as a surety on the bank loan. The appellants urge that Nix's obligation on notes 2 and 3 was not secondary but primary. Thus, Nix did not guarantee the loan as required by the contract and *a fortiori* the Fosters did not indemnify him from any loss except based on a guarantee.

The obvious purpose of the indemnity agreement was to insure

that Nix would not suffer a financial loss as a result of entering into an agreement with the bank guaranteeing that the balance owed on the note would be paid. He did enter into an agreement and did have to pay the balance owed on the note after the corporate funds were exhausted. It begs the question to posit that he was required to pay as a surety and not as a guarantor. Regardless of what legal status could be theorized to have existed as between Nix and the bank, the bank proceeded against Nix based on his guaranty agreement and he paid thereunder.

This transaction fell within the clear intention of the parties to the indemnity agreement and in such light met the requirements thereof.

(c) The Fosters claim that the failure to assert a justifiable defense to the claim of the bank releases them as indemnitors. This is in effect a repetition of previous arguments that the corporation did not actually receive a loan and therefore did not owe the bank anything. Hence, it is argued, the failure to assert a valid defense served to release the Fosters from any liability. *GAF Corp. v. Tolar Constr. Co.*, 246 Ga. 411 (271 SE2d 811) (1980). We recognize that no indemnification may be recovered if the party had a defense which would have defeated the action but failed to assert it. However, this presupposes the existence of such a defense. As has been pointed out previously, while there might be some evidence that a defense was available the proof offered in no way demanded a finding that there was a defense which would have defeated the claim. In such circumstances, the jury was authorized to find, as they did, that the right to indemnification had not been lost.

2. It is urged that it was error to permit plaintiff's counsel to cross-examine the defendant Patricia Foster as to whether she was liable on the indemnity agreement — the witness answered affirmatively. It was objected to on the ground that it called for a legal conclusion and related to the ultimate issue on trial.

Generally, a witness is not permitted to express an opinion as to the ultimate issue for to do so invades the province of the jury. *Byrd v. State*, 163 Ga. App. 718 (3) (294 SE2d 686) (1982). However, as the Supreme Court noted in *Ga. Farm Bureau Mut. Ins. Co. v. Wall*, 242 Ga. 176, 178 (249 SE2d 588) (1978): "[r]egardless of what the rule may be as to a party testifying as to a legal conclusion (the ultimate issue in the case) in *his favor*, a party generally is permitted to testify that his opponent made a legal conclusion against himself, i.e., made an admission against interest . . ." (Emphasis supplied.)

The actual questions and responses were:

"Q. Do you admit that you owe Dr. Nix money because of that document [the indemnity agreement]?

A. If that's what this document says, whatever this document

says . . . [At this point objection was interposed on the ground that it involved the ultimate issue in the case, and was overruled because the witness was a party.]

Q. Do you admit owing Dr. Nix money under that document?

A. Under this document? That's what that document says?

Q. Yes.

A. Yes."

We are inclined to agree that defendant's answer was probably not responsive. But insofar as it was, clearly it would amount to an admission against interest and would not fall within the prohibition against testimony involving the ultimate issue.

3. The remaining enumeration of error is not meritorious.

*Judgment affirmed. Birdsong, P. J., and Carley, J., concur.*

DECIDED MARCH 8, 1985.

*Stanley E. Harris, Jr., James P. Gerard,* for appellants.
*John M. Tatum,* for appellee.