**FEDERAL PAPER BOARD
COMPANY, INC.,**
Plaintiff,

v.

**HARBERT–YEARGIN,
INC., Defendant.**

**No. 1:97–CV–0449A–JEC.**

United States District Court,
N.D. Georgia,
Atlanta Division.

June 5, 1998.

Christopher D. Balch, James T. McDonald, Jr., Swift, Currie, McGhee & Hiers, Atlanta, GA, for Plaintiff.

Trammel C. Gilliland, Gray & Gilliland, Perimeter Ridge, Atlanta, GA, for Defendant.

### ORDER

CARNES, District Judge.

This case is before the Court on plaintiff Federal Paper Board Company, Inc.'s Motion for Summary Judgment [17] and defendant Harbert–Yeargin, Inc.'s Motion for Summary Judgment [16] and Objection to Evidence for Consideration in connection with Competing Motions for Summary Judgment [25]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that plaintiff's Motion for Summary Judgment [17] should be **DENIED** and defendant's Motion for Summary Judgment [16] should be **DENIED** and its Objection to Evidence for Consideration in connection with Competing Motions for Summary Judgment [25] should be **GRANTED**.

### BACKGROUND

Both plaintiff and defendant move for summary judgment on the issue of whether they entered into a valid and enforceable contract, and if they did, whether the contract requires defendant to partially indemnify plaintiff for its cost in settling a wrongful death suit for the death of Timothy Paul Powell, an employee of defendant, at plaintiff's Augusta paper mill on April 18, 1996. Plaintiff contends that the parties entered into a contract containing an indemnification provision. Defendant maintains that the parties never contracted, and even if they did, they did not agree to an indemnification provision. If defendant is not able to demonstrate that it is entitled to summary judgment on either of these contractual issues, then the Court must also determine whether plaintiff waived its right to seek indemnification from defendant by settling the underlying suit.

Plaintiff owns and operates a paper mill in Augusta, Georgia. (See Def.'s Statement of Material Facts [16] at ¶ 1.) Early in 1994, plaintiff began preparing "for a production line shutdown to perform routine maintenance on its dryer for the Number 2 paper machine." (See Compl. [1] at ¶ 5.) At plaintiff's soliciting, contractors submitted bids to perform this work. (See Def.'s Statement of Material Facts [1] at ¶ 1.)

On February 23, 1994, defendant submitted a bid to perform the required tasks for $59,750. (Id. at ¶ 3.) On March 28, after engaging in negotiations with Jim Michau, a senior plant engineer and project manager for plaintiff at the Augusta mill, concerning the cost, scope, and contractual provisions of the maintenance work to be performed, defendant lowered its bid to $54,750. (Id. at ¶ 4.)

During the course of these negotiations, Michau delivered to defendant plaintiff's general terms and conditions to its purchase orders. (Id. at ¶ 5.) Michau instructed defendant to put in writing any objections it had to the proposed terms and

conditions. (*Id.* at ¶ 6.) Thereafter, Marv Fischer, defendant's contracts manager, wrote an internal memorandum to Chuck Farris, the director of defendant's pulp and paper group, and Dave Massie, another employee of defendant, detailing a number of conditions that defendant did not wish to accept. (*Id.* at ¶ 7.) On March 30, Farris conveyed defendant's concerns regarding eight of the conditions dealt with in Fischer's memorandum to plaintiff via a letter to Michau. (*See* Fischer Dep. at Exs. 3, 4.)[1]

One of the eight conditions defendant objected to was Article 26.2 of the proposed contract. As initially drafted, Article 26.2 would have required defendant to indemnify plaintiff for virtually any form of loss "directly or indirectly" related to activities arising out of the work to be performed under the contract. (*See* Def.'s Mot. for Summ. J. [16] at Ex. 16, Art. 26.2.) Farris's letter proposed that Article 26.2 be changed so that defendant would only have to indemnify plaintiff for claims arising directly from defendant's own negligence. (*See* Def.'s Statement of Material Facts [16] at ¶ 10.)

On April 4, Farris again wrote Michau.[2] In this letter, defendant reduced its bid price to $48,750, requested that the contract be issued based on the clarifications previously sent to plaintiff, and stated that it would begin to mobilize at plaintiff's mill on April 11 in preparation for the anticipated shutdown of the mill on April 18.

(*Id.* at ¶ 11.) On April 5, defendant's construction manager, Tony Ross, had a conversation with Fred Chase, a representative of plaintiff's procurement department. This conversation led Ross to believe that plaintiff, through Chase, had accepted defendant's proposed revisions to plaintiff's general terms and conditions. (*Id.* at ¶ 12.) Following this conversation, Ross prepared to incorporate a few minor changes proposed by Chase into the alterations defendant had proposed in Farris's March 30 letter to Michau. (*See* Ross Dep. at 32.)

As soon as Ross finished, and signed the letter that he was preparing, he received a conference call from Farris and Michau.[3] (*Id.* at ¶ 14.) Michau told Ross that plaintiff would not accept most of defendant's proposed alterations to the contract, including defendant's proposed changes to the indemnification agreement set out in Article 26.2. (*Id.* at ¶ 16; *see also* Michau Dep. at 88–89.) Ross then suggested that Michau propose alternative language and forward his proposal to defendant. Michau committed to doing this by the sixth or seventh of April. (*Id.* at ¶ 15.) Neither Michau nor any other representative of plaintiff ever forwarded a proposal for alternative language to defendant.[4] (*Id.* at ¶ 17.)

The only remaining material fact pertaining to the existence of a contract containing an indemnity provision upon which the parties are in agreement is that at

1. The concerns expressed in the March 30 letter from Farris to Michau were the only objections to plaintiff's general terms and conditions that defendant ever made known to plaintiff. The remaining concerns included in Fischer's internal memorandum were never expressed to plaintiff. (*See* Fischer Dep. at 50–51.)

2. On April 4, plaintiff also sent defendant a purchase order for the work to be performed.

3. David Massie was also in Ross's office at the time of this telephone call and took part in the discussion. (*See* Ross Dep. at Ex. 2.)

4. Michau's deposition testimony contradicts defendant's assertion that he agreed to submit proposed alternative language to be incorporated into plaintiff's general terms and conditions to its purchase orders. Rather, Michau stated that he informed defendant's representatives that they could either accept the terms and conditions, including the indemnification agreement, as originally proposed, or forego working in plaintiff's mill. (*See* Michau Dep. at 71.)

some point after the April 5 teleconference, the dates set for defendant to mobilize at the mill and begin work were pushed back a week. Most significantly, the parties disagree on the status of negotiations at the conclusion of the April 5 teleconference, and the meaning that should be attributed to a letter from Fischer to Michau on April 11, in light of that status.

On April 11, Fischer sent Michau a letter requesting that Michau incorporate three agreed upon changes into the contract language.[5] This letter began, "The following is wording agreed to for the contract covering the referenced project. Please include in the contract and forward a copy for our review as agreed in your recent telephone conversation with Chuck Farris and Tony Ross." (*See* Michau Dep. at Ex. 25.) The letter concluded by stating, "We hope this meets with your approval and look forward to hearing from you and receiving your contract." (*Id.*) Defendant contends that this letter merely memorialized three provisions upon which the parties had reached agreement, and that the remaining issues raised in Farris's March 30 letter were still unresolved. (*See* Def.'s Statement of Material Facts [16] at ¶ 19.) Plaintiff, however, contends that these three issues were all that were left to be resolved, and at this point the parties had reached an agreement.[6] (*See* Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 19.)

A number of memoranda internal to defendant were also issued around this time. Though these memoranda are dated after April 11, plaintiff contends that they predate the April 11 letter from Fischer to Michau and that the dates are out of sequence for the events as they actually occurred. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 21, *citing* Farris Dep. at 111.) These memoranda imply that negotiations with plaintiff were still ongoing and a final agreement had not been reached. (*See* Def.'s Statement of Material Facts [16] at ¶ 21.)

Defendant also took two further actions relevant to the issue of whether a contract existed between the parties to which the parties provide different meanings. First, on April 11, defendant provided plaintiff with certificates of insurance in the amount required by the contract. (*See* Pl.'s Statement of Material Facts [17] at ¶ 7.) Plaintiff contends this action demonstrates the existence of an agreement between the parties (*id.*), while defendant states that it took this action in anticipation of contracting. (*See* Def.'s Resp. to Pl.'s Statement of Material Facts [18] at ¶ 7.) Second, on April 18, defendant mobilized workers and equipment at plaintiff's mill and began "preliminary pre-shutdown work." (*Id.* at ¶ 8.) Defendant claims it did this merely as a show of good faith in recognition of the fact that a shutdown at a paper mill results in the loss of significant

---

5. None of these changes implicated Article 26.2.

6. Michau testified that the April 5 teleconference did not conclude when he informed Ross, Farris and Massie that plaintiff would not accept the majority of defendant's proposed changes to plaintiff's standard terms and conditions. Rather, Michau stated that a long conversation ensued in which the parties were able to come to terms. Michau related that plaintiff would accept the three changes to the contract included in Fischer's April 11 letter and defendant would drop the other

issues originally raised in the March 30 letter from Farris to Michau. Michau further stated that defendant was willing to drop the other issues, including those related to indemnification set out in Article 26.2, because it knew that plaintiff would need contractors to perform work on much larger projects in the future and it was attempting to get its foot in the door. (*See* Michau Dep. at 93–95.) Farris agreed that the parties reached a final agreement pursuant to the April 11 letter from Fischer to Michau. (Farris Dep. at 119–120.)

revenue.[7] Thus, defendant sought to demonstrate that it was ready to do the work. (*Id.*) Plaintiff, however, states that defendant does not allow its employees to begin to mobilize at a job site until a contract has been agreed to, and, therefore, this action demonstrates the existence of a contract. (*See* Pl.'s Statement of Material Facts [17] at ¶¶ 8–9, *citing* Ross Dep. at 53.)

On April 18, Paul Timothy Powell, defendant's employee, was performing preliminary activities in plaintiff's Augusta mill in preparation for the shutdown scheduled for April 25. (*See* Def.'s Statement of Material Facts [34] ¶ 34.) Prior to beginning work, Powell and other employees of defendant held a "tool box" meeting in which they discussed the jobs to be performed that day and the safety hazards presented, specifically: that the machines they would be working around would be operating, that the machines possessed rotating shafts, and that tools, clothing and bodies could be caught in the machines.[8] (*Id.* at ¶¶ 36–38.)

Part of Powell's duties on the eighteenth included erecting scaffolding around portions of plaintiff's number two paper machine. (*Id.* at ¶ 35.) From his attendance at the tool box meeting, he should have been aware that this machine would be operating and that it possessed an unguarded rotating shaft. (*Id.* at ¶ 37.) Powell attempted to build a guard to place over the shaft. (*Id.* at ¶ 43.) After deciding that he could not use the guard he had built, however, he attempted to build a scaffold above the rotating shaft. (*Id.*) Together with George Cassity, another employee of defendant who plaintiff alleges was acting as Powell's foreman,[9] Powell erected pole scaffolding next to the number two paper machine. (*Id.* at 44.) While engaged in this activity, Powell was wearing safety lines, or "lanyards", which he "bundled" in an attempt to prevent them from tripping him, or from becoming entangled in the functioning machine. (*Id.* at ¶ 45.) After completing the erection of the pole scaffolding, Powell and Cassity proceeded to lay planks of wood over the horizontal pole scaffolding support members. (*See* Cassity Aff. [16] at Ex. A, ¶ 11.) These planks were to serve as a platform for workers during the mill-wide shutdown. (*Id.*)

While moving about the pole scaffolding and preparing to install additional wooden planks upon the pole scaffolding, Powell leaned forward. (*Id.* at ¶ 12.) Tragically, one of the safety lines attached to Powell's body swung free, caught on the rotating shaft,[10] and pulled Powell forward, off the scaffolding and into the machine. (*See* Def.'s Statement of Material Facts [16] at ¶ 46.) As a result, Powell suffered fatal injuries. (*Id.* at ¶ 46.)

On April 19, defendant withdrew its employees from plaintiff's mill, claiming that there was no contract between the parties.

7. Plaintiff alleged that the shutdown of a paper mill could result in up to $200,000 in lost revenue per day. (*See* Compl. [1] at ¶ 6.)

8. While plaintiff admits most of defendant's submitted material facts pertaining to the danger presented by the rotating shaft at the center of this controversy, it continuously asserts that though the danger presented by the presence of rotating shafts was discussed and readily apparent, the rotating shaft in question had a "protruding grease fitting" on its end which was neither discussed nor readily apparent. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶¶ 38–39, 41–44.)

9. Plaintiff asserts that Cassity was acting as Powell's foreman and was directing Powell's actions on defendant's behalf on April 28. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 44.) Plaintiff did not direct the court to any evidence, however, to support this assertion.

10. Plaintiff contends, specifically, that the safety line caught on a protruding grease fitting on the shaft that was not readily apparent and had not been discussed at the tool box meeting. (*See* Pl.'s Resp. to Def.'s Statement of Material Facts [20] at ¶ 46.)

(*See* Pl.'s Statement of Material Facts [17] at ¶¶ 11–12.) Plaintiff took possession of defendant's equipment[11] and performed the maintenance work with the aid of another contractor. (*Id.* at ¶ 13.)

Powell's widow sued plaintiff, and one of its employees, for the wrongful death of her husband. (*See* Compl. [1] at ¶ 24.) This suit was settled for $781,448.[12] Plaintiff thereafter brought this suit seeking to enforce a contractual indemnification obligation it claims it is owed by defendant.[13] Both parties now move for summary judgment.

## I. Summary Judgment Standard

Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of every element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. 2548.

The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. 2548; *Apcoa, Inc. v.*

*Fidelity Nat'l Bank,* 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex,* 477 U.S. at 325, 106 S.Ct. 2548. After the movant has carried his burden, the nonmoving party is then required to "go beyond the pleadings" and present competent evidence[14] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. 2548, *quoting* FED. R. CIV. P. 56(e). While the court is to view all evidence and factual inferences in a light most favorable to the nonmoving party, *Samples v. City of Atlanta,* 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. 2505. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. 2505. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for

---

11. Article 21 of plaintiff's proposed general terms and conditions gave plaintiff the right to seize defendant's tools and equipment should defendant fail to comply with the contractual provisions. (*See* Pl.'s Mot. for Summ. J. [17] at 4.)

12. Defendant was immune from direct suit for Powell's death under Georgia's worker's compensation law. (*See* Def.'s Resp. to Mot. for Summ. J. [18] at 2 n. 1.)

13. This suit was originally filed in state court and was subsequently removed on the basis of diversity jurisdiction. (*See* Notice of Removal [1].)

14. The nonmoving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. 2505. Thus, to survive a motion for summary judgment, the nonmoving party must come forward with specific evidence of every element material to that party's case so as to create a genuine issue for trial.

## II. Existence of a Contract

Both plaintiff and defendant move for summary judgment on the issue of whether they formed a valid and binding contract concerning the work defendant was allegedly to perform in plaintiff's Augusta paper mill and, if such a contract exists, whether it creates indemnity obligations running from defendant to plaintiff. Due to the fact that there are material issues of fact in dispute, both plaintiff's and defendant's motions for summary judgment as to these issues will be denied.

Plaintiff argues that the Court should find the existence of a contract containing indemnity obligations running from defendant to plaintiff for four reasons. First, the April 11 letter from Fischer to Michau communicated defendant's agreement and acceptance of the three remaining unresolved terms and conditions of the contract, as modified by that letter. (*See* Pl.'s Mot. for Summ. J. [17] at 5.) Second, Farris had the apparent authority to bind defendant and stated to plaintiff on April 11 that a deal had been struck. (*Id.*) Third, defendant's actions after April 11 demonstrate the acceptance of a contract

by part performance. (*Id.* at 8.) Fourth, the contract reached contained an indemnity provision because defendant knew that plaintiff would not budge on this issue and, by contracting with plaintiff, defendant accepted the indemnification provision. (*Id.* at 10.)

Defendant, however, moves that the parties did not contract due to the fact that they did not mutually assent to all of the contract's material terms. Namely, defendant argues, the parties did not mutually assent to the inclusion of an indemnity provision. (*See* Def.'s Mot. for Summ. J. [16] at 16.) Defendant attempts to support this position by arguing that their proposed alterations to the indemnification provision contained in Farris's March 30 letter to Michau were rejected, and that the April 11 letter never mentions indemnification.[15] (*Id.*) Further, defendant points out that plaintiff cannot point to any document containing an indemnity agreement agreed to and signed by the parties. (*See* Def.'s Resp. to Pl.'s Mot. for Summ. J. [18] at 16; Farris Dep. at 122, 123.) Finally, defendant points to a number of internal memoranda created after April 11 indicating that no agreement had been reached. (*See* Def.'s Mot. for Summ. J. [16] at 16–17.)

In Georgia, a contract does not exist "unless the parties agree to all of its material terms and conditions and nothing is left to future agreement." *Dibrell Bros. Int'l S.A. v. Banca Nazionale Del Lavoro*, 38 F.3d 1571, 1582 (11th Cir.1994), *citing Pelletier v. Zweifel*, 921 F.2d 1465, 1503 (11th Cir.1991), *cert. denied*, 510 U.S. 918, 114 S.Ct. 311, 126 L.Ed.2d 258 (1993). As such, agreements to agree or preliminary statements of intent to contract in the future are unenforceable. *See Doll v. Grand Union Co.*, 925 F.2d 1363, 1367

---

**15.** Defendant also initially challenged plaintiff's claim on the grounds that an oral agreement to indemnify violates the statute of frauds. Defendant, however, has since ac-

quiesced that the statute of frauds does not bar plaintiff's claim. (*See* Def.'s Resp. in Supp. of Mot. for Summ. J. [23] at 1.)

(11th Cir.1991), citing *Hartrampf v. Citizens & S. Realty Investors,* 157 Ga.App. 879, 278 S.E.2d 750, 752 (1981).

A preliminary agreement, however, may become enforceable due to the subsequent actions of the parties. *See Sanders v. Commercial Cas. Ins. Co.,* 226 Ga.App. 119, 121, 485 S.E.2d 264 (1997) (citations omitted). Moreover, part performance of the terms of a contract can be evidence of the acceptance of the terms of the contract. *Id.* ("an objection of indefiniteness may be obviated by performance on the part of one party and acceptance of the performance by the other").

The finding of the existence of a contract thus turns on whether the evidence demonstrates the parties' assent to all of the material terms of the alleged contract at the point in time at which enforcement of the contract is sought. *See Sanders,* 226 Ga.App. at 121, 485 S.E.2d 264. If such assent is demonstrated, courts have been willing to enforce unexecuted agreements, and oral agreements, where the parties contemplated that a more formal written contract would be completed in the future. *See Barton v. Chemical Bank,* 577 F.2d 1329, 1336 (5th Cir.1978) (whether oral contract may be enforceable even where parties contemplate execution of written agreement is question of intent). The reason for this is that "[i]n such a situation, the court is merely enforcing what the evidence suggests was the intent of the parties." *Doll v. Grand Union Co.,* 925 F.2d 1363, 1370 (11th Cir.1991).

The intent of the parties to an alleged contract is the determinative factor as to whether the parties assented to all of the material terms of the alleged contract. In order to ascertain whether the parties assented to the terms of a contract, courts in Georgia utilize an objective theory of intent. Under this theory, "one party's intention is deemed to be that meaning a reasonable man in the position of the other contracting party would ascribe to the first party's manifestation of assent, or that meaning that the other contracting party knew the first party ascribed to his manifestations of assent." *Amwest Sur. Ins. Co. v. RA–LIN & Assocs., Inc.,* 216 Ga. App. 526, 530–31, 455 S.E.2d 106 (1995) (citation omitted). Courts may look to extrinsic evidence, such as correspondence and discussions, to determine the intent of the parties. *Id.*

As there are material facts in dispute concerning the assent of the parties to the terms of the contract, neither plaintiff nor defendant is entitled to summary judgment on the issue of whether the parties entered into a valid and enforceable contract. As the Court is unable to decide as a matter of law whether the parties contracted, the Court does not reach the issue of whether the alleged contract contains an indemnity provision. *See Mayer v. R.S. Turner,* 142 Ga.App. 63, 64, 234 S.E.2d 853 (1977) (citation omitted) (parties' intent ordinarily a question of fact left to jury).

The most significant factual dispute as to whether defendant assented to the terms of the contract, as plaintiff alleges, concerns the status of negotiations prior to the April 11 letter from Fischer to Michau and the meaning that should be attributed to that letter in light of that status. Defendant argues, and submitted evidence in support of its argument, that numerous issues were still being negotiated[16] and that this letter just memorialized the parties' agreement concerning three of these issues. (*See, e.g.,* Def.'s Mot. for Summ. J. [16] at 7, *citing* Fischer Dep. at 73.) Defendant therefore contends that its subsequent acts of supplying insurance in the

---

16. Defendant's argument that negotiations were ongoing is undermined by the fact that there is no evidence of any discussions *between plaintiff and defendant* concerning the alleged contract after April 11. (*See* Pl.'s Rep. in Supp. of Mot. for Summ. J. [26] at 2–3.)

amount specified by the contract and mobilizing at plaintiff's mill were merely gestures of good-faith negotiating. Plaintiff argues, and submitted evidence in support of its argument, that the parties had reached an agreement on all but three issues and these three issues were resolved in Fischer's letter. *See supra,* at 1347 n. 7; *see also* Michau Dep. at 95. Plaintiff submits that defendant's subsequent actions are consistent with the existence of a contract and bolster its position that an agreement had been reached. Taking each parties' factually supported assertions as true, *the material fact* is in dispute. Namely, whether Fischer's April 11 letter to Michau signified that a ·deal had been struck.

As the question of whether the parties contracted cannot be resolved at this point in time, the issue of whether the alleged contract contained an indemnity provision also cannot be resolved. As a matter of common sense, if there is no valid and enforceable contract, there could be no indemnity provision. Plaintiff's argument demonstrates the logic of this conclusion. Plaintiff argues that defendant knew it would not budge on the issue of indemnification and, therefore, by contracting with plaintiff, defendant necessarily accepted this provision.[17] If the parties did not agree to all of the material terms of the contract, as defendant argues and as the Court must accept at this juncture, as there are material facts in dispute, however, then not only would there not be an indemnification obligation, but arguably there would be no contract. Due to the existence of this factual dispute, both parties' motions for summary judgment must be denied.

■■■ Plaintiff also argues that defendant clothed Farris' with apparent authority to bind it to a contract and that the latter agreed to a contract and, specifically, to the indemnity agreement. In Georgia,

> [a]pparent authority is that which the principal's conduct leads a third party reasonably to believe the agent has; it creates an estoppel allowing third parties to bind a principal to the agent's acts on account of the principal's conduct, reasonably construed by third parties acting in innocent reliance thereon. Where there were no manifestations of authority by the principal to a third party, apparent authority is not an issue. *Morris v. Williams,* 214 Ga.App. 526, 527(2), 448 S.E.2d 267 (1994).

*Bresnahan v. Lighthouse Mission, Inc.,* 230 Ga.App. 389, 496 S.E.2d 351, 354 (1998) (internal citations omitted). Thus, it is the principal's conduct that is crucial to the creation of apparent or ostensible authority.

In *Bresnahan,* the president of the defendant corporation signed a contract purporting to bind the corporation to the sale of a parcel of real property. *Bresnahan,* 496 S.E.2d at 354. The president told plaintiff that he had the authority to so bind defendant and that defendant's board of directors had approved the contract. *Id.* Pursuant to defendant's corporate bylaws, defendant could only be bound to a contract through the signatures of at least two of its officers or directors and, therefore, the president did not have actual authority to bind defendant. *Id.* More importantly, plaintiff could not point to any evidence demonstrating that defendant had held the president "out as anyone who, on her sole signature, could bind the corporation on the sale or transfer of any property." *Id.* Therefore, the court held that apparent authority was not an issue. *Id.; see also Gosule v. Bestco, Inc.,* 227

17. Defendant, itself, stated that it knew that plaintiff would not budge on the issue of indemnification. (*See* Def.'s Statement of Material Facts [16] at ¶ 16; Def.'s Mot. for Summ. J. [16] at 9, *citing* Michau Dep. at 86.)

Ga.App. 863, 864, 490 S.E.2d 532 (1997) ("Gosule has pointed to no conduct on behalf of Bestco which reasonably led him to believe that Ragsdale had apparent authority to hire and pay him").

 In this case, the sole evidence plaintiff points to as alleging clothing Farris with apparent authority is the fact that no one associated with defendant ever "revoked, modified or limited" Farris's authority. (*See* Pl.'s Mot. for Summ. J. [17] at 6.) Plaintiff did not, however, point to any affirmative act on the part of defendant creating the impression that Farris had the authority to single handedly bind the defendant. Further, the evidence demonstrates that plaintiff dealt with a number of defendant's agents and that Michau dealt with individuals other than Farris when he felt the need to make clear that plaintiff would or would not accept certain contractual provisions. Thus, on the current evidence, the Court cannot conclude, as a legal matter, that Farris had apparent authority to bind defendant. Farris's statements that he believed the parties had reached an agreement as of April 11, and the like, are, however, admissible as extrinsic evidence supporting the existence of the alleged contract.

In summary, the Court DENIES both parties' motions for summary judgment with regard to the issue of the existence of a contract.

### III. Did Plaintiff have a Complete Defense to the Underlying Claim?

 Plaintiff seeks indemnification, in an amount equivalent to the percentage of the loss caused by defendant's negligence, for the loss it sustained in settling the wrongful death suit brought against it by Powell's widow. Under Georgia law, if a party seeking to be indemnified had a complete defense to the underlying action, then a claim for indemnification may not be maintained. *Foster v. Nix,* 173 Ga.App. 720, 727, 327 S.E.2d 833 (1985). That is, in the absence of a legal compulsion to suffer a loss, there is no right to sue a third party for indemnification for that loss. *GAF Corp. v. Tolar Constr. Co.,* 246 Ga. 411, 271 S.E.2d 811 (1980). Defendant argues that plaintiff had a complete defense to the claims made by Mr. Powell's widow—based on either an assumption of the risk theory or the doctrine of avoidance—and hence that defendant should not be required to indemnify plaintiff.

Conversely, O.C.G.A. § 51–12–32(c) provides:

> Without the necessity of being charged by an action or judgment, *the right of indemnity,* express or implied, from another or others shall continue unabated and *shall not be lost or prejudiced by compromise and settlement of a claim* or claims for injury to person or property or for wrongful death and release therefrom.

O.C.G.A. § 51–12–32(c)(emphasis added). Thus, plaintiff argues that the mere fact that plaintiff settled the underlying action does not preclude its action for indemnification.

The parties have offered little guidance to the Court as to how these potentially inconsistent principles may be harmonized nor as to how the phrase "complete defense" should be defined.[18] Similarly, in the discussion of the potential defenses of assumption of the risk and avoidance, neither party identifies the negligent act for which Mr. Powell assumed the risk nor are the parties consistent about whether it is plaintiff's negligence, defendant's negligence, or both, on which the Court should

---

18. The parties' omissions are somewhat understandable in that the Georgia case authority, or at least that cited by the parties, does not offer much assistance on these questions either.

focus in analyzing these defenses.[19]

With these questions unanswered, determination of the summary judgment motion has been difficult. Although not granting summary judgment, however, the Court will further outline its concerns in order that counsel may address these issues prior to any trial of this case.

### A. What is a "complete defense?"

Georgia law prohibits indemnification if the person seeking the latter had a complete defense to the claims brought by a third party, yet, what does the term "complete defense" mean? One plausible meaning could be that one has a complete defense *only* when one has a defense that would be successful as a matter of law. Thus, if the party seeking indemnification could have asserted a defense on which he would have succeeded as a matter of law in a motion for summary judgment, he cannot demand indemnification against those damages he has unnecessarily paid. *See, e.g., GAF Corp. v. Tolar*, 246 Ga. 411, 271 S.E.2d 811 (defendant had a defense available—statute of limitations—that *would have defeated the claim*) (emphasis added); *Foster*, 173 Ga.App. at 725, 327 S.E.2d 833 (it is not enough that a defense was available; the proof in no way demanded a finding that there was a defense that would have defeated the claim). Applying that standard to this case, the question then becomes whether plaintiff could have successfully pursued a motion for summary judgment against Mrs. Powell on the ground that Mr. Powell had assumed the risk or could have avoided the dangers that caused his death.[20]

The alternative to the above construction of the phrase, a "complete defense," is a definition that looks only to whether the party seeking indemnification "would" have won at the summary judgment stage *or* at a jury trial. A jury's review of the defense would arise only after it is first determined that the party seeking indemnification would not have succeeded as a matter of law on its defenses. Here, for reasons discussed below, the Court has determined that plaintiff did not have a successful defense as a matter of law. Thus, to determine whether plaintiff, the party seeking indemnification, "would" have successfully defended against Mrs. Powell's claims in a jury trial, this Court would have to convene a jury to sit as if it were hearing the claims of Mrs. Powell and to decide whether plaintiff could succeed on any affirmative defenses available to it. (Unlike in a real trial between plaintiff and Mrs. Powell, however, in this "mock" trial, plaintiff would be advocating Mrs. Powell's position and would presumably attempt to undermine any defenses it had; defendant, on the other hand, would be advocating plaintiff's position and arguing either that plaintiff was not negligent or that it should have succeeded on an assumption of risk theory).

There are sound arguments in support of defining a complete defense as only these defenses that would have succeeded as a matter of law. First, O.C.G.A. § 51–12–32(c) provides that a settlement of the underlying claim shall not cause the right to indemnity to be lost or prejudiced. A defendant in a tort case, such as this, settles the case because, even though it may have defenses, it cannot be sure that a jury will accept those defenses, particularly where the deceased worker has suffered the horrific and fatal injuries that

---

**19.** For example, defendant indicates at one point in its brief that it is the defendant's negligence that is at issue ([16] at 18), but at another point indicates that plaintiff had "viable defenses," (*Id.* at 21) suggesting that it is plaintiff's negligence on which the putative defense should focus.

**20.** Defendant argues that plaintiff would have been successful on such a motion: an argument with which the Court disagrees and which it will address below.

occurred here. Accordingly, even though the tort defendant may believe that it was not at fault and that it *might* win at a jury trial, to minimize the risk of a large award of damages in the event that the jury disagrees with the defendant's position, the defendant will settle the case for a dollar figure that is arguably less than the sum the plaintiff might have won after a jury trial. If, however, the tort defendant must participate in a jury trial on the underlying claims following its settlement of the case, in order to receive indemnification, its settlement of the case may well have negatively impacted its ability to be made whole by the indemnitor, as the jury in this "mock" trial may well decide that defendant was not liable after all. Moreover, such a procedure creates an incentive for a party who has promised to indemnify the tort defendant to stonewall and refuse to honor its contract of indemnification in the hope that the tort defendant will be forced to settle the case, but will then have his efforts at indemnification foiled by the results of a jury trial that the prior settlement sought to avoid.

In short, potential unfairness inheres in a rule that forces a tort defendant to decide between taking a case with an available defense to trial in the hopes of a favorable verdict, thereby exposing the party to a tremendous amount of liability, or settling the case, only to have the party against whom indemnification is sought then claim, after the fact, that the tort defendant would have won the underlying case on the available defense and thus should not receive any indemnification. There are also some practical realities that enhance the perception of unfairness as to that procedure in this case; specifically, the results of the "mock" indemnification trial may well not mimic what would have been the results of a real trial between the real plaintiff, the widow, and the real tort defendant, the plaintiff in this case. First, the tort defendant (plaintiff in this action

for indemnification) might have particularly feared a jury trial on the underlying claim brought by the widow of the deceased as that case would have been tried in the hometown area where the deceased resided and where local sympathy for the widow would likely be high. In this action for indemnification, however, which was removed by the putative indemnitor to federal court, the jury pool will extend well beyond the hometown area of the deceased and jury sympathy may well be lessened. Moreover, the tort defendant's (plaintiff here) assessment of the unlikelihood of success in a trial against the widow may realistically differ from its assessment of its chances in a trial against another company on an indemnification claim. That is, the plaintiff here could have reasonably assessed its risk of an adverse verdict as being very high in a trial on the underlying claim where the widow of a construction worker is suing a large company for damages that she has suffered as a result of the death of her husband, which death was caused by the latter's attempt to perform a requested service for that company. The jury appeal of this underlying claim could well be substantially lessened when the widow and her deceased husband disappear as plaintiffs, however, and, instead, both the plaintiff and defendant are corporations feuding over whether one company owes the other money. A jury may be more willing to take a hard, analytical look at an assumption of the risk defense in a trial over indemnification between two companies than it would if such cold analysis meant depriving a widow of much needed financial support. In summary, there are practical difficulties in creating a trial between these two parties that would mimic the same trial that would have occurred had Mrs. Powell's case against plaintiff gone to trial. Those difficulties—causing plaintiff's assessment of its chances against Mrs. Powell to represent a very different calculation than its assessment of its chances against defendant in an indemnity

action—potentially created a Hobbesian choice for plaintiff in deciding whether to settle the case or go to trial.

Accordingly, there are policy reasons favoring a rule that a "complete defense" means a successful defense as a matter of law. Nevertheless, that the latter seems to this Court to be a reasonable construction of the term does not necessarily mean that it is the construction that would be adopted by Georgia courts, and it is Georgia law that this Court must follow.[21] Further, there is arguably an even better procedural way to handle the impasse that results when a tort defendant asserts the right to indemnification for damages sought by a tort plaintiff. If the indemnitor contests liability, the fairest mechanism would likely be to require the tort defendant in such a case to join the indemnitor in the underlying case, if possible, or to seek a declaratory judgment against the party subject to indemnification prior to the trial of the underlying claim.[22] The parties have not indicated whether such mechanisms were available in this case and why, if they were available, they were not pursued.

Most importantly, this Court does not decide whether a "complete defense" means only a defense as a matter of law for a very simple reason: plaintiff has not asked this Court to adopt that rule. Instead, in opposing defendant's motion for summary judgment, plaintiff argues that defendant has not established that plaintiff would have succeeded as a matter of law on any available defenses and that there are disputed issues of fact on this matter. Plaintiff does not argue that it should receive summary judgment because defendant has not demonstrated a defense as a matter of law. Instead, plaintiff seems to assume that a jury will have to decide whether plaintiff's defenses would bar recovery by Mrs. Powell. Presumably, the jury's decision will then decide the "complete defense" question. Indeed, as they do not address this point, the cases cited by the parties do not contradict plaintiff's assumption that a jury trial may be the appropriate way to determine the issue. Accordingly, unless defendant can establish that plaintiff had a defense as a matter of law, the parties seem to agree that a jury must determine the merit of plaintiff's affirmative defenses against Mrs. Powell's claims.

### B. Has Defendant Established That Plaintiff's Affirmative Defenses Would Have Succeeded as a Matter of Law?

Defendant argues that the duty that Mr. Powell voluntarily undertook—to erect scaffolding above a dangerous rotating shaft so that work requested by defendant in that area could begin—was so inherently dangerous that Mr. Powell, by agreeing to perform this work for his employer, assumed the risk of being killed and similarly that Mr. Powell could have avoided the risk, presumably by walking off the job. Defendant cites an older, very

---

**21.** For example, in *Foster*, the Georgia Court of Appeals stated that an indemnitor's obligation to indemnify applies unless the evidence "demanded a finding that there was a defense which would have defeated the claim." 173 Ga.App. at 727, 327 S.E.2d 833. This statement suggests that, absent the existence of a successful defense as a matter of law, the indemnitor cannot rely on the potential existence of a valid defense. Yet, this inference from the quoted statement is tempered by the fact that the defense in question was submitted to a jury, which concluded that the defense was without merit. ("In such

circumstances, the jury was authorized to find, as they did, that the right to indemnification had not been lost." *Id.*)

**22.** It has become quite routine for insurance companies who dispute coverage of an insured who has been sued, which insured seeks a defense and coverage by the insurance company, to pursue a declaratory judgment regarding its obligations prior to the trial of the underlying litigation.

general line of Georgia case authority in support of its argument. Plaintiff, however, cites another, somewhat newer, line of authority that takes a more restrictive view of these defenses when applied to a construction worker who is doing nothing more than the task his employer has directed him to do. These cases cited by plaintiff note that a strict application of a rule that a worker's knowledge of a potential risk bars recovery for a third party's negligence would mean that a construction worker could never recover for injuries as most construction work is inherently dangerous. *Styles v. Mobil Oil Corporation,* 218 Ga.App. 48, 49, 459 S.E.2d 578 (1995); *Kitchens v. Winter Company Builders, Inc.,* 161 Ga.App. 701, 703, 289 S.E.2d 807 (1982). Moreover, this line of authority notes the coercion inherent in a construction worker's purportedly voluntary decision not to perform a potentially dangerous task requested by his boss; that is, refusal will generally mean termination from the job. *Styles, id.; Union Camp Corporation v. Dukes,* 217 Ga.App. 95, 97–98, 456 S.E.2d 645 (1995); *Kitchens, id.* Finally, these cases also indicate that, in examining assumption of risk, one must focus on whether a safer alternative than the one chosen by the worker existed. *Union Camp, id.; Kitchens, id.*

Applying these recent cases to this case, the Court concludes that there are disputed issues of material fact and that plaintiff, could not have, prevailed as a matter of law, on the defenses asserted by defendant. Accordingly, for the reasons discussed above, a jury shall decide not only the factual disputes regarding the existence of an indemnity agreement, but it shall also decide whether plaintiff's putative defenses are meritorious. The Court therefore DENIES DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO ITS ARGUMENT THAT PLAINTIFF HAD A COMPLETE DEFENSE TO MRS. POWELL'S CLAIMS.

Having said that the jury will decide the merit of these affirmative defenses, the Court must still confess its uncertainty as to the context in which that debate will be framed. Specifically, as noted, neither party has articulated well what the putative negligence of each party was.[23] Accordingly, it is difficult to assess an assumption of risk defense in that factual vacuum. Moreover, even if an assumption of risk defense does not lie, a tort plaintiff must still prove negligence in order to succeed on her claim. *Styles,* 218 Ga.App. at 48–49, 459 S.E.2d 578. Presumably, as to the underlying tort claim at the upcoming trial, the plaintiff and defendant will be treated as potential joint tort feasors. Defendant will seek to show that plaintiff would have prevailed at any trial on this underlying claim either because defendant assumed the risk/could have avoided the danger or because plaintiff was not negligent. (In an ironic turn of affairs, plaintiff, of course, will presumably argue that plaintiff was negligent enough to be held liable for Mr. Powell's death). Plaintiff will not only have to withstand defendant's attack on the above grounds, but plaintiff will presumably have to show negligence by the defendant, as plaintiff cannot be indemnified if it is the sole tort feasor. Indeed, plaintiff agrees that it can only be indemnified for damages caused by defendant's negligence.

The Court will direct the parties, at a future date, to submit a trial brief discuss-

**23.** The Court is only given hints as to the theory of liability in the underlying case. For example, plaintiff states, "There are numerous facts which create an issue of fact concerning Federal's potential liability. We built the platform. We were cited for violating OSHA standards, as was Yeargin." (Pl.'t Reply in Supp. of Mot. for Summ. J. [26] at 5.) But even when such hints are given, the Court is left to guess at such crucial things as what platform plaintiff is referring to and what OSHA standards plaintiff and defendant violated.

ing the proof that will be present on the issue of each party's alleged negligence.

## IV. Defendant's Objection to Affidavit of John C. Bell and Accompanying Videotape

The Court sustains defendant's objection as to the affidavit of John C. Bell and the report of Robert D. Coston. These documents are not relevant to the summary judgment motion and have not been considered.

### CONCLUSION

For the foregoing reasons, plaintiff's Motion for Summary Judgment [17] is **DENIED** and defendant's Motion for Summary Judgment [16] is **DENIED**. Defendant's Objection to Evidence for Consideration in connection with Competing Motions for Summary Judgment [25] is **GRANTED**.